## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| WEI WANG, JOHN LINDSTROM, individually and on behalf of all others similarly situated,<br><br>                          Plaintiffs,<br><br>v.<br><br>TD AMERITRADE, INC.,<br>TD AMERITRADE FUTURES & FOREX LLC<br>dba THINKORSWIM,<br><br>                          Defendants. | Case No. 1:20-cv-04028<br>**CLASS ACTION**<br>**JURY TRIAL DEMANDED**<br><br>Hon. Virginia M. Kendall |

## AMENDED COMPLAINT

Plaintiffs, WEI WANG and JOHN LINDSTROM file this class action complaint individually and on behalf of all others similarly situated against Defendants, TD AMERITRADE and TD AMERITRADE FUTURES AND FOREX, LLC (TDFF) dba THINKORSWIM (TOS), demanding a trial by jury.  Plaintiffs make the following allegations based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.  Accordingly, Plaintiffs allege as follows:

## INTRODUCTION

1.      Plaintiffs assert this action pursuant to Section 6b(e)3 of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 9, *et seq.*, and 17 C.F.R. Sec. 180.1 of the regulations promulgated pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), on behalf of themselves and

all similarly-situated customers Of TD AMERITRADE ("TDA")and TD AMERITRADE FUTURES AND FOREX LLC ("TDFF") also doing business as THINKORSWIM ("TOS").

2.    TDA/TDFF engaged in acts, practices, and a course of business that operated recklessly as a fraud or deceit upon Plaintiffs and the class.  As described in detail below, TDA/TDFF mishandled Plaintiff's and class members futures and options investments on April 20, 2020, in that TDFF:   i) failed to provide material information to Plaintiffs regarding the possibility of the price of their NYMEX Light Sweet May 20 Crude Oil Futures contracts (May 20 Crude Oil) and associated contracts going to a price of zero; ii) failed to provide Plaintiffs a way to exit, roll, modify or offset their long positions in May 20 Crude Oil;  iii) failed to liquidate Plaintiffs' and class members' futures and options on futures investments in a reasonable manner on April 20, 2020 when May 20 Crude Oil fell to a price of zero and proceeded to trade into negative prices; and iv) liquidated plaintiffs' positions in a commercially unconscionable manner.

3.    While Plaintiffs recognize that TDA/TDFF had discretion to liquidate, TDA/TDFF did not have discretion to liquidate in the reckless and commercially unreasonable way that it did.  TDA/TDFF knew about the potential for the markets' volatile condition – including the possibility that the price of the May 20 Crude oil contract could trade into the negative, and that the crude oil contract becomes more volatile during the

2

delivery period - everything it needed to exercise its discretion to liquidate in an active and volatile market in a reasonable manner.

4. Yet TDA/TDFF recklessly liquidated Plaintiff's long crude oil position, causing thousands of dollars in losses to Plaintiff and other class members- losses that could have been significantly reduced or completely avoided.

5. In offering trading services, TDA/TDFF assumed a duty to ensure that its systems and customer services were sufficiently equipped to reliably deliver services under foreseeable customer demands and market conditions as what occurred on April 20, 2020. Plaintiffs and members of the proposed class understood and had the reasonable belief that TDA/TDFF would be prepared for a market event it was warned of. Yet despite having knowledge of the possibility of crude oil futures trading negatively for weeks, TDA/TDFF failed to disclose this possibility to its trading customers, correct its own deficiencies on its online trading platform and customer service, and chose to ignore the warning of the relevant exchanges.

6. TDA/TDFF did not i) take action to alert its customers to the possibility that the price of May 20 Crude Oil Contract could go to zero; ii) prepare its trading systems to be able to accept trades if the price of the May 20 Crude Oil contract declined to zero and into negative prices or, alternatively provide a way for the customers to place orders manually or

through a separate vehicle, since its automated trading systems could not accept negatively priced Crude Oil orders; and, finally iii) take action to promptly liquidate positions in the May 20 Crude Oil contracts in accounts which became under-margined when the May 20 Crude Oil contract declined to zero and into negative prices, causing clients' accounts to lose thousands of dollars and in some instances incur debit balances.

7.    TDA/TDFFs' failure to provide its clients with material information, and its failure to liquidate its client's positions in a commercially reasonable manner [promptly] also violated the implied covenant of good faith and fair dealing contained in its Futures Client Agreement and acted with negligence and gross negligence.

8.    TDA/TDFF's reckless actions make them liable for tens of millions in actual damages incurred by Plaintiffs and the class.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. § 1331. the CEA, 7 U.S.C. Sec. 25(c).  The Court also has subject matter jurisdiction under 28 U.S.C. Sec. 1332(d) because (i) the matter in controversy exceeds $75,000, exclusive of interest and costs; ii) there are members of the proposed class who are citizens of a different state than Defendants; and (iii) there are in aggregate more than 25 members of the proposed class

4

10. This Court has personal jurisdiction of the Defendant because it systematically operates, conducts, and engages in and carries out a business or business venture in Chicago Illinois.

11. Venue is proper in this District pursuant to & U.S.C. Sec. 25(c) because the Defendants are found and transact business in this District. Venue is proper in this Court pursuant to 28 U.S.C. Sec. 1391(b)(1) because TDFF is subject to personal jurisdiction in the state of Illinois with respect to this civil action, and in this district

### PARTIES

12. Plaintiff Wei Wang is an individual and resident of the state of Utah. He was a client of TDFF at all times relevant throughout the class period.

13. Plaintiff John Lindstrom is an individual and resident of the state of South Dakota. He was a client of TDFF at all relevant times throughout the class period.

14. TDFF is a financial services company and affiliate of TDA. TDFF acts as a commodities broker and is registered as a futures commission merchant (FCM) with the Commodity Futures Trading Commission (CFTC) and is a member of the National Futures Association (NFA). TDFF conducts futures business under the dba ThinkOrSwim and is engaged in providing futures execution services to clients of TDFF. At all times TDFF conducted business in this District where it provided services to Plaintiffs.

15. TD Ameritrade Inc. is a registered brokerage and registered investment advisor that is listed on the NASDAQ under the ticker symbol, AMTD.

## FACTUAL BACKGROUND

### A. Relevant Statutes and Rule

16.　　7 U.S.C. **§** 6b(e)3 makes it unlawful to engage in an act that operates as a fraud or deceit in connection with the making of an options contract:

> *It shall be unlawful for any person, directly or indirectly,…in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery (or option on such a contract), …to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.*

17.　　7 U.S.C. § 9, *et seq*, establishes that it is illegal to employ or engage in any swap, or contract of sale, of any commodity in interstate commerce, to provide false information  regarding the same, or to engage in false or fraudulent reporting, of the same. It also gives the administrative agencies the power to create specific regulations for enforcement. 17 C.F.R. § 180.1 was promulgated under this statute.

18.　　17 C.F.R. §180.1,a rule promulgated by the CFTC under  Dodd-Frank states:

> *(a) It shall be unlawful for any **person**, directly or indirectly, in connection with any **swap**, or **contract of sale** of any **commodity** in interstate commerce, or contract for **future delivery** on or subject to the rules of any **registered entity**, to intentionally or recklessly: . . .*
>
> *(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to **state** a material fact*

*necessary in order to make the statements made not untrue or misleading;*

*(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person; or,*

*(4) Deliver or cause to be delivered, or attempt to deliver or cause to be delivered, for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate. Notwithstanding the foregoing, no violation of this subsection shall exist where the person mistakenly transmits, in good faith, false or misleading or inaccurate information to a price reporting service.*

19.     Section 25 of the CEA creates a private right of action for violations of

Sections 6b(e).  Section 25(a)(1)(B) states that:

> *[a]ny person…who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages…caused by such violation to any person-…who made through such person any contract of sale of any commodity…; or who deposited with or paid to such person money…in connection with any order to make such contract….*

20.     Section 25 also creates a private right of action for violations of Rule

180.1.  Section 25(a)(1)(D) states that:

> *[a]ny person…who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages…caused by such violation to any other person- …who purchased or sold a contract [of sale of any commodity for future delivery (or option on such contract or any commodity)] if the violation constitutes - …the use or employment of, or an attempt to use or employ, in connection with …a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, manipulate device or contrivance in contravention of such rules and regulations [promulgated pursuant to Dodd-Frank]…*

**B.    TDFF Accounts**

21.    To invest in and trade futures and options on futures with TDFF, the investor is required to open futures account by entering in a Futures Client Agreement with TDFF.  A copy of the Futures Client Agreement is attached as Exhibit A.

22.    In order to open an account with TDFF, Plaintiffs were first required to open a securities account with its affiliate, TD Ameritrade.  A copy of the Client Agreement is attached as Exhibit B.

**C.    Plaintiffs Purchase Futures and Options on Futures on the May 20 NYMEX Light Sweet Crude Oil Contract**

23.    Plaintiffs are individual investors with brokerage accounts at TDFF.  The Plaintiffs' investments at issue here, are futures and options on futures contracts in the May NYMEX Light Sweet May 2020 Crude Oil contract (herein referred to the "May 20 Crude Oil contract").

24. A futures contract is a legally binding agreement to buy or sell a standardized asset on a specific date or during a specific month. "Trading in futures contracts is facilitated through a futures exchange.

25. The fact that futures contracts are standardized and exchange-traded makes these instruments indispensable to commodity producers, consumers, traders, and investors.

26. An option on a futures contract gives the option holder the right, but not the obligation, to buy or sell a specific futures contract at some point in the future at a specified price.

**D.    May 2020 NYMEX Light Sweet Crude Oil Contract**

27. On April 20, 2020, Plaintiff's account contained substantial long positions (that is, he owned futures and/or options in May 2020 NYMEX Light Sweet Crude Oil futures contracts and/or options on the May 2020 NYMEX Light Sweet Crude Oil futures contracts through TDFF).  The NYMEX Light Sweet Crude Oil futures contract is traded on the Chicago Mercantile Exchange ("CME") under trading symbol CL, Minimum Tick Size: $0.01 per barrel, worth $10.00 per contract. This contract is deliverable meaning that at the expiration of the contract month crude oil is physically delivered to the buyer of the contract.

28. Plaintiffs accounts also held substantial long positions in *E-Mini* Light Sweet Crude Oil futures (QM) and options on these contracts through

TDFF.  The E-Mini Light Sweet Crude Oil futures contracts are tied to the NYMEX Light Sweet Crude Oil futures contract, but are smaller, in that, the E-mini Light Sweet Crude Oil futures contracts are traded in 0.025 increments and the full-sized Light Sweet Crude Oil futures are traded in 0.01 increments. The trading symbol for the contract is QM and is traded on the CME. The E-mini contract is financially settled upon expiration of the contract – i.e. there is no physical delivery of crude oil for purchasers of the contract. The settlements in the E-mini Crude Oil (QM) futures contracts are derived directly from the settlements of the regular sized Crude Oil (CL) futures contracts, rounded to the nearest tradable tick.

29.    NYMEX Sweet Light Crude Oil futures and options, as well as the smaller -mini contracts, trade actively on the Chicago Mercantile Exchange and their prices change throughout the trading session in response to economic events and market activity.

30.    On April 8, 2020, the Chicago Mercantile Exchange (CME) the commodity exchange on which Crude Oil and E-mini Crude Oil futures and options are traded and cleared, sent out a regulatory advisory, entitled, "CME Clearing Plan to Address the Potential of a Negative Underlying in Certain Energy Options Contracts."  The purpose of which was "to let the market know that CME Clearing is ready to handle the situation of negative underlying prices in major energy contracts and [we want] to

give all of our clearing firms, customers, and partners a view into what the CME Clearing plan is so that each of our partners can do their own respective planning for this potential situation." The "underlying" referred to in the subject of the advisory are the underlying futures contract or WTI Crude Oil futures, RBOB Gasoline futures and Heating Oil futures. This April 8, 2020 CME advisory announced that it had been testing plans to support the possibility of a negative options if in any month WTI oil futures settled between $8.11 and $11 a barrel, but that it could switch to a different pricing model that would allow for a negative price in WTI oil futures.

31.   On April 15, 2020, the CME sent out another advisory to clearing firms, CFO, back-offices, and futures commission merchants that they had provided an environment where firms could test negative prices, " Effective immediately, firms wishing to test such negative futures and/or strike prices in the systems many utilize CME's 'New Release' testing environments, for products CL (crude oil futures) and LO (options on those futures.)'" Undoubtedly the Defendants also received this notice.

32.   On the morning of April 20, 2020, at approximately 10:50 CST, the CME issued a third warning that oil prices could go negative, leaving TDA/TDFF most of the trading day (WTI futures remained positive until approximately 2:08 pm CST) to liquidate positions, increase variation or

maintenance margin or communicate this to all its customers. It did nothing.

33. On April 20, 2020, the May E-mini crude oil futures contract (symbol /QMK20 on TD Ameritrade's platform) gradually declined throughout the day and then dropped from $0 to -$37.62 during the last 15 minutes of trading before settlement and expiration. (Exhibit C)

34. Nowhere in any risk disclosure agreement, nor in its Futures Client Agreement, provided by TDFF to its customers or traders does TDFF warn that negative prices can occur.

35. At no time subsequent to April 8, 2020 and before occurrence of negative oil prices on April 20, 2020, did TD Ameritrade or TDFF institute substantially greater margin requirements for all its traders and clients knowing, as it knew, that negative prices, and hence potentially infinite risk, was a real possibility.

36. At no time subsequent to April 8, 2020 and before occurrence of negative oil prices on April 20, 2020, did TD Ameritrade or TDFF decide to mitigate losses by stopping trading at zero, or forcing liquidations at zero.

37. Despite possessing knowledge of the possibility of oil futures markets trading negatively for weeks prior to April 20, 2020, TD Ameritrade/TDFF failed to test its online platform and ready its system to correct deficiencies and failed to disclose to its customers that it would ignore the multiple warnings issued by the CME and NYMEX.

38. TD Ameritrade/TDFF promotes investing in futures as a way of diversification and leverage, and promoted the trading of cash settled futures in order to entice the retail customer with the idea that settlement risk could be avoided. Futures is touted as an investment suitable for the individual retail investor at TD Ameritrade/TDFF in their individual and IRA accounts.

39. In offering trading services, TDA/TDFF assumed a duty of care to ensure that its trading and customer support systems were sufficiently equipped to reliably deliver trading services under the foreseeable customer demands and market conditions that occurred on April 20, 2020. Plaintiffs and class members understood and reasonably assumed that TDA/TDFF would honor its representations and covenants with its customers and be prepared.

40. TDFF Ameritrade failed to live up to its risk disclosure document (Exhibit D) where it states "multiple, robust risk management in process" and failed to liquidate client positions even when their account equity fell below zero.

41. During that period, clients of TDFF were not able to place orders in the May 20 Crude Oil products and therefore were not able to modify, offset or exit their positions. The automated order platform for TDFF did not recognize negative pricing in the contract and when attempting to place an order in the May 20 Crude Oil contract once the price continued to decline

past zero, the platform's message stated: "FUTURE ORDERS MUST
HAVE A POSITIVE LIMIT PRICE."

42.     TDFF was unprepared for the market events of 4/20/20 and did not even
provide a valid quote below zero on its platform.

43.     Additionally, Plaintiff's accounts were not closed out promptly when the
price fell below zero and the accounts did not contain enough cash to
maintain the positions. Instead, the long Crude Oil positions were
permitted to remain in the account long after the account was under-
margined resulting in substantial losses to Plaintiffs' accounts.

44.     In fact, on the morning of April 20th, Plaintiff Lindstrom 's account was
long three (3) contracts of May 20 Light Crude Oil futures contracts (2
purchased 3/18/20 and 1 on 3/19/20).

45.     Plaintiff Lindstrom, seeing that his account had a margin call (in the
amount of $8,402.50 from Friday's close 4/17/20) and that the price of the
Crude Oil contracts were declining, on Monday morning 4/20/20,
Lindstrom transferred $30,000 (US) via ACH (Automated Clearing House)
to TDA/TDFF for his TDFF account.

46.      Plaintiff Lindstrom, having not been informed by TDFF that the crude
oil market had the potential to decline to zero or beyond, believed he was
depositing more than enough money to not only meet the margin call, but
also to enable him to maintain the crude oil contracts in the event the

market continued to move against the positions requiring additional margin, with the intent to later roll them into the June contract.

47. In spite of Plaintiff Lindstrom's efforts to properly margin his account, his positions were not closed out promptly when the price fell below zero and the account did not contain enough cash to maintain the positions. Instead, TDFF permitted the long Crude Oil position to remain in the account long after the account was under-margined resulting in substantial losses to Plaintiff's account.

48. In fact, with respect to Plaintiff Lindstrom, TDFF's untimely forced liquidation of his Crude Oil positions resulted in a loss of $66,390 on the three Crude Oil contracts.

49. TDFF's actions in permitting the long Crude Oil position to remain in the account long after the account was under-margined in the case of certain other Plaintiffs not only resulted in a loss of all cash in the account, but also resulted in a debit balance.

50. In fact, in Plaintiff Wang's account, the account ended the day with a loss on 6 long May Crude Contracts of -165,602.50- having begun the day with a positive balance of $60,230.79

51. Generally, in the futures market, to mitigate risk, a certain amount of money must always be maintained on deposit when trading with a futures broker this is called margin. When a trader first enters a futures position, the trader must post the initial margin requirement. Once the position is

established, the trader is held to a maintenance margin requirement, which is less than the amount of the initial margin requirement. If the equity in a customer's account drops below the maintenance margin requirement due to adverse price movement, the broker will issue a "margin call" to restore the customer's equity to the initial margin requirement.

52. The CFTC defines a margin call as a request from a brokerage firm to a customer to bring margin deposits up to initial levels.[i] If an account goes below the amount required to be posted as maintenance margin, then a margin call is made, and the account must be replenished to bring the amount back up to the initial margin requirement, or an amount that may be required by the futures commission merchant during the trading day in order to maintain the trading position. If a margin call is not met within a short time frame, often within a business day, the position may be liquidated or closed.

53. According to the terms of TDFF's own risk disclosure statement (Exhibit D), it is stated that TD Ameritrade/TDFF will liquidate positions if they exceed the margins required. However, TDFF failed to abide by its policy on 4/20/20 with regards to oil. As a result of this failure, Plaintiff's account as well as accounts of other individual retail investor accounts ended with large negative balances which could have been avoided had TD Ameritrade acted in good faith and made an attempt to close out the

positions on 4/20/20 when the accounts became under-margined or even when customer equity fell below zero.

54.     The "Disclosures" incorporated into the Futures Client Agreement informed Plaintiffs that:

> *If the market moves against your position, you may be called upon by your broker to deposit a substantial amount of additional margin funds, on short notice, in order to maintain your position,* **If you do not provide the required funds within the time required by your broker, your position may be liquidated at a loss**, *and you will be liable for any resulting deficit in your account.* (Emphasis added).

55.     At no time was Plaintiff Wang contacted by TDFF and given notice relating to a margin call.  Nor was he provided the opportunity to offset his position, roll his position to the next contract month, or provide funds because he was under-margined.

56.      TDFF did nothing when the price of May 20 Crude Oil hit zero and proceeded into negative pricing, knowing that Plaintiffs would not be able to place an order to exit the position or roll the position to the next contract month, and where Plaintiff's losses would have been limited.  In fact, Plaintiff Wang's losses would have been limited to at least to just over $10 per contract, or a loss of around $30,000 instead of a loss of -$165,602.50.  Plaintiff Lindstrom's losses could have also been limited.

Alternatively, TDFF could have liquidated Wang and the Class members when their accounts initially became, under-margined, thereby substantially mitigating if not eliminating losses.

57. The possibility of the contract going to zero should have been anticipated by TDFF [as an futures commission merchant responsible for the execution of Plaintiff's trades on CME] and TDFF should have alerted its clients particularly prior to the date of delivery, April 20th. To the extent that TDFF concluded that Plaintiff's positions became under-margined, TDFF should have closed Plaintiff's positions promptly.

58. Instead of taking either of the commercially reasonable alternatives outlined above, TDFF acted recklessly. It failed to take action to permit its clients the ability to place orders in the May 20 Crude Oil contract when the price touched zero and declined into negative pricing, and further, failed to liquidate Plaintiff's accounts promptly when the accounts became under-margined, but waited to do so long after the account became under-margined and sustained extreme losses leaving the account with a debit balance.

59. The failure of TDFF to act to mitigate investor losses by offsetting their positions promptly or within a reasonable time of the accounts becoming under-margined, or to contact clients to notify them of the fact the CL market was at zero and providing them with an option to exit, modify, offset roll the position by placing an order via another means other than

an automated order platform (which was not able to recognize negative pricing), caused severe losses to Plaintiffs and the class members who had long futures positions in the May Crude Oil contract.

60. In those accounts incurring debit balances, TDFF has sent letters demanding payment for such deficiencies.

61. TDA/TDFF knew or should have known about the possibility of the Crude Oil markets incurring negative pricing as it executed trades in these markets for clients cleared through CME; which had notified firms that the CL price had the potential to go to zero and to prepare for this possibility. TDFF failed to notify/advise their customers of material information regarding the crude oil markets, although it was clear based upon the CME's advisory that the contract had the potential to go to zero and to prepare for such an event. The omission of a material fact prevented Plaintiff from making an informed decision regarding the management of their positions in the Crude Oil contracts as they were not aware of the potential for loss in this market.

62. Upon information and belief, TDA/TDFF has settled with some trading customers and made them whole and offered other customers, including the Plaintiff some accommodation based upon the inability to execute a trade during the time prices were negative, or to call in an order to execute a trade and liquidate long positions.

63. TDA/TDFF was not the only brokerage firm for whom the negative oil prices exposed inadequacies in its software. Other brokerage firms like E*TRADE and Interactive Brokers also had issues with their software.

64. But by contrast Interactive Brokers, which admitted to having a software deficiency during this time, made all their customers whole admitting to a "$113 million mistake." Thomas Peterffy, the chairman and founder of Interactive Brokers stated that they would, "rebate from our own funds to our customers who were locked in with a long position during the time the price was negative any losses they suffered below zero."[1]

65. TDFF has treated its customers differently. TD Ameritrade has chosen to credit the losses back to the accounts of some of its larger traders but not all its traders. This goes against the rules for impartial and fair treatment of customers

66. Any recovery of TDFF on any debit purportedly owed by Plaintiff is barred by TDFFs violations of 17 C.F.R. Sec. 180.1, as well as their breach of the covenant of good faith and fair dealing.

67. On September 9, 2020, after an audit, Taiwan's FSC (Financial Supervisory Commission) announced that it was imposing sanctions on 12 futures brokers for violating futures management laws and regulations as a result of not having being prepared for the market events of April 20,

---

[1] https://www.bloomberg.com/news/articles/2020-05-08/oil-crash-busted-a-broker-s-computers-and-inflicted-huge-losses

2020 and lacking internal controls.  The FSC ordered all 12 brokers to issue customer refunds and fined them $754,000.[2]

## CLASS ACTION ALLEGATIONS

68.   Plaintiffs seek certification of a class of participants (the "Class") as follows:

All persons, corporations, and other legal entities that held long futures positions (or short put positions) with TDFF on April 20, 2020, who were damaged by TDFFs failure to inform them of the possibility of the May 2020 Crude Oil futures contract going to zero or the forced sale or liquidation of their May 2020 Crude Oil futures or options positions on April 20, 2020; or who were unable to place orders to offset, modify or exit their May 20 Crude Oil futures or options position on April 20, 2020.

69.   Excluded from the Class are Defendants, and their directors, officers, or employees.

70.   This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, because it meets all the requirements of Rule 23(a)(1-4), including the numerosity, commonality, typicality and adequacy requirements, and it satisfies the requirements of Rule 23(b)(3) in that the predominance and superiority requirements are met.

---

[2] https://www.fsc.gov.tw/ch/home.jsp?id=2&parentpath=0&mcustomize=

71. Numerosity. The Class is so numerous that individual joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that at least 60 geographically-dispersed Class members transacted in Crude Oil futures or options through TDFF and lost millions of dollars during the Class Period.

72. Commonality. There are numerous questions of fact or law that are common to Plaintiffs and all the members of the Class. Common issues of fact and law predominate over any issues unique to individual Class members. Issues that are common to all class members include but are not limited to the following:

    a. Whether Plaintiffs and class members held long futures positions or short put option positions in May 20 Crude Oil contracts in accounts at TDFF on April 20, 2020;

    b. Whether Plaintiffs and class members entered into the Futures Agreement with TDFF;

    c. Whether TDFF liquidated Plaintiffs' and class members long futures positions May 20 Crude Oil or short put option positions in the contract on April 20, 2020;

    d. Whether Plaintiffs were unable to (due to the inability of TDFFs automated trading system to accept an order) exit, modify or offset their long futures positions or short options positions in the May 20

Crude Oil contracts for their accounts when the contract hit the price of zero and after at approximately 12:00 p.m. on April 20, 2020;

e.  Whether Plaintiffs were informed by TDFF of the possibility of the May 20 Crude Oil contract declining to a price of zero before April 20, 2020.

f.  Whether TDFFs liquidation of Plaintiffs' May 20 Crude Oil positions were reckless and commercially unreasonable and breached the TDFF Futures Client Agreement's implied covenant of good faith and fair dealing;

g.  Whether Defendants were in breach of its contracts or the implied covenant of good faith and fair dealing in connection with its fairly to provide adequate technology and customer service support in a timely manner;

h.  Whether Plaintiffs and other class members are entitled to injunctive and declaratory relief; and Whether Plaintiffs and class members were damaged by the liquidation.

73.  <u>Typicality</u>.  Plaintiffs have claims that are typical of the claims of all the members of the Class.  Plaintiffs' claims and all of the class members' claims arise out of the same uniform acts and course of business employed by TDFF on April 20, 2020 and arise under legal theories that apply to the claims of Plaintiffs and all other members of the Class.

74. <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent the interests of the members of the Class. Plaintiffs do not have claims that are unique to Plaintiffs, nor are there defenses unique to Plaintiffs that could undermine the efficient resolution of the Class' claims. Further, Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in class action litigation, to represent them. There is no hostility between Plaintiffs and the unnamed class members. Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

75. <u>Predominance</u>. Common questions of law and fact predominate over questions affecting only individual class members. The only individual issues likely to arise will be the exact amount of damages recovered by each class member, the calculation of which does not bar certification.

76. <u>Superiority</u>. A class action is superior to all other feasible alternatives for the resolution of this matter. Individual litigation of multiple cases would be highly inefficient and would waste the resources of the courts and of the parties.

77. <u>Manageability</u>. This case is well suited for treatments as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented on a class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

78. Defendants have acted similarly with respect to the entire Class by uniformly subjecting Plaintiffs and the Class to the course of business described above.

**COUNT 1**
**Violations of CEA, 7 U.S.C. § 9, and 17 C.F.R. Sec. 180.1**

79. Plaintiffs incorporate the allegations of paragraphs 1 through 78 as if fully set forth herein.

80. TDFF failed to notify/advise their customers of material information regarding the crude oil markets, that it had the potential to go to zero, although it was clear based upon the CME's advisory that the contract had the potential to go to zero and to prepare for such an event. The omission of a material fact prevented Plaintiff from making an informed decision regarding the management of their positions in the Crude Oil contracts as they were not aware of the potential for loss in this market.

81. Furthermore the failure of TDFF to act to mitigate investor losses by offsetting their positions promptly or within a reasonable time of the accounts becoming under-margined, or to contact clients to notify them of the fact the CL market was at zero and providing them with an option to exit, modify, offset roll the position by placing an order via another means other than an automated order platform (which was not able to recognize negative pricing), TDFF caused severe losses to Plaintiffs and the class members who had long futures positions in the May Crude Oil contract.

And for those accounts incurring debit balances TDFF has sent letters demanding payment for such deficiencies.

82. By doing so, Defendants violated 180.1 in that its conduct was reckless or intentional in violation of 17 C.F.R. §180.1(a)(3)

**COUNT II**
**Breach of Implied Covenant of Good Faith and Fair Dealing**

83. Plaintiffs incorporate the allegations of paragraphs 1 through 82 as if fully set forth herein.

84. Plaintiffs and class members each signed the Futures Agreement, which contains a provision giving TDFF discretion to liquidate Plaintiffs and class members May 20 Crude Oil long futures positions and short puts positions.

85. Implicit in that provision is a covenant of good faith and fair dealing that TDFF will exercise its discretion to liquidate in a good faith and in a commercially reasonable manner.

86. TDFF acted unreasonably when it failed to promptly or within a reasonable time, liquidate Plaintiffs' positions when the accounts became under-margined leading to excessive losses and in many cases deficit balances in the accounts on April 20, 2020.

87. Additionally, the Futures Agreement provides that TDFF will execute orders on behalf of its clients which states, "All orders placed by Client may be executed on any exchange or other market where such business is transacted by TD Ameritrade Futures & Forex or its agent in the

discretion of the Firm or such agent, deemed to be most desirable, unless otherwise instructed."

88.    Furthermore TDFF failed to provide Plaintiffs with the ability to place an order to exit, modify, offset roll the position by placing an order via another means other than an automated order platform (which was not able to recognize negative pricing), causing severe losses to Plaintiffs and the class members who had long futures positions in the May Crude Oil contract.

89.    By doing so, TDFF breached the Futures Client Agreement's implied covenant of good faith and fair dealing.  Plaintiffs and class members have been damaged as a result.

## COUNT III
### Violation of CEA Section 6b(e)3

90.    Plaintiffs incorporate the allegations of paragraphs 1 through 89 as if fully set forth herein.

## COUNT IV
### Negligence

91.    Plaintiffs hereby incorporate the allegations of paragraphs 1 through 90 as if fully set forth herein.

92.    TDA/TDFF had a duty to exercise reasonable care in conducting and facilitating transactions for its customers.

93. TDA/TDFF unlawfully breached its duties by, among other things, failing to provide adequate technological systems and customer support necessary to perform under the contract and denying Plaintiffs and class members from acting in a timely manner.

94. TDA/TDFF's negligence and breach of duties to the Plaintiffs and class members proximately caused losses and damages that would not have occurred but for TDA/TDFF's breach of its duty of care. These losses reflect damages to Plaintiffs and class members in an amount to be determined at trial or separate proceeding as necessary.

**COUNT V**
**Gross Negligence**

95. Plaintiffs hereby incorporate the allegations of paragraphs 1 through 94 as if fully set forth herein.

96. TDA/TDFF had a duty to exercise reasonable care in conducting and facilitating transactions for its customers.

97. TDA/TDFF unlawfully breached its duties by among other things failing to provide adequate technological systems and customer support necessary to perform under the contract and denying Plaintiffs and class members from acting in a timely manner, and exposing them to unlimited risk.

98. TDA/TDFF's conduct as alleged in this Amended Complaint were and continue to be a departure from the ordinary standard of care. On April

20, 2020, TDA/TDFF constructively abandoned its customers by leaving them either unable to place orders or reach an order desk. As a result, Plaintiffs and class members incurred substantial losses.

99.     TDA/TDFF's gross negligence and breach of its duties owed to the Plaintiffs and class members proximately caused losses and damages that would not have occurred but for TDA/TDFF's gross breach of its duty of care.

## COUNT VII
## BREACH OF CONTRACT

100.    Plaintiffs hereby incorporate the allegations of paragraphs 1 through 99 as if fully set forth herein.

101.    By not contacting Plaintiffs as required in the Disclosures section of the Futures Client Agreement, before liquidating their positions, TDFF breached the Futures Client Agreement.

102.    Furthermore, paragraph 1 of TDFF's Client Agreement expressly states that "[t]ransactions shall be subject to the constitutions, bylaws, customs and usages of the exchange or market where executed (and of its clearinghouse, if any)…"

103.    However, TDFF did not act in accordance with the customs and usages of the relevant exchange (CME), and blatantly breached its agreement with Plaintiffs by failing to ensure that transactions it executed in Crude Oil contracts traded on the exchange for its customers were subject to the rules, customs and usages as instructed by the CME in its advisories.

104. The CME, in its custom and practice of providing information relating to the usage of the exchange for the trading of crude oil, advised and directed FCMs utilizing its markets, including TDFF, of the possibility of the oil futures markets trading negatively and providing an environment where firms could test their software with negative prices.

105. Despite being forewarned on multiple times for weeks prior to April 20, 2020, TD Ameritrade/TDFF failed to test its systems and correct for deficiencies. They also failed to warn their customers that they would ignore the advisories of the CME and the NYMEX.

106. TDA/TDFF's breach of contract resulted in substantial damages and losses to the Plaintiffs and class members.

**COUNT VIII**
**DECLARATORY RELIEF**

107. Plaintiffs hereby incorporate the allegations of paragraphs 1 through 106 as if fully set forth herein.

108. An actual and justiciable controversy exists between Plaintiffs and TDFF regarding the validity of a Futures Arbitration Agreement that was purportedly electronically signed by Plaintiff Wei Wang (and any other TDFF arbitration agreement that TDFF may contend that another Plaintiff electronically signed).

109. The CFTC regulations governing the use of electronic signatures contain two principal requirements. First, they define an "electronic signature" as

an "electronic . . . symbol" that is "**attached to or logically associated with** a *record*." *See* 17 C.F.R. § 1.3 (emphasis added). In addition, in order for an FCM to rely on electronic signatures, it:

> *[M]ust adopt and use reasonable safeguards* regarding the use of electronic signatures, **including at a minimum safeguards employed to prevent alteration of the electronic record** . . . [emphasis added]

110.  17 C.F.R. § 1.4 (emphasis added). TDAFF does not comply with either requirement. First, when a TDFF client initially "signs" a purported arbitration agreement, TDFF's computers do not store a copy of the relevant "record" -that is the text supposedly agreed to by the client.

111.  TDFF also does not employ "minimum safeguards . . . to prevent alteration of the electronic record . . . after such record has been electronically signed." See 17 C.F.R. § 1.4. The arbitration language used by TDFF resides only inside of its software code. TDFF does not perform periodic tests of the system to determine whether it accurately stores changes to prior versions of the software code that includes arbitration language. Moreover, at any given time 20 different programmers could have access to the software system.

112.  TDFF requires no special authorization before any programmer can modify arbitration language. Nor is there any warning or notification to supervisors when arbitration language is modified.

113. Even though there is nothing that would prevent TDFF's system from creating and storing in a safe place a PDF or other record that would safely preserve arbitration language at the time that the customer agrees to it, TDFF does not have such a system in place. TDFF has not employed even "minimum safeguards . . . to prevent alteration of" it's electronic arbitration records. See 17 C.F.R. § 1.4.

114. Plaintiffs contend that TDFF's failure to comply with CFTC regulations regarding electronic signatures renders any electronic signature on a TDFF Futures Arbitration Agreement invalid and the agreement unenforceable.

115. There is now a controversy in that the counsel for TDFF has informed a Plaintiff that he must arbitrate any dispute with TDA/TDFF.

116. Accordingly, pursuant to 28 U.S.C. section 2201, Plaintiffs request this Court declare that TDFF 's electronic signatures are invalid renders and that the invalidity of the signatures renders the Futures Arbitration Agreement unenforceable.    Furthermore, Plaintiffs were forced to sign an agreement with TDA as a necessary pre-condition of opening a futures account with TDFF.

117. TDA's Client Agreement prohibits the use of arbitration for class action lawsuits.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, Wei Wang and John Lindstrom, on behalf of themselves and all similarly situated customers of TD Ameritrade Futures and Forex LLC dba ThinkorSwim, respectfully demand judgment against Defendants for:

(a)   Damages as set forth above, plus all other relief as the Court may deem appropriate;

(b)   That the Court certify this lawsuit as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be designated as class representatives and that Plaintiffs' counsel be appointed as Class counsel;

(c)   That the Court award Plaintiffs and the Class damages against Defendants for their violations of the Commodity Exchange Act;

(d)   That the Court award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law;

(e)   That Defendants be permanently enjoined and restrained from continuing to expose retail investors and traders to unlimited risk in their futures accounts;

(f)   That the Court declares that Defendants are not entitled to recover any purported deficiency amounts from Plaintiffs;

(g)     That the Court determines that TDFF's Arbitration Agreement is
        unenforceable;

(h)     That the Court award Plaintiffs and the Class prejudgment interest at the
        maximum rate allowable by law; and

(i)     Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs
demand a jury trial as to all issues triable by a jury.

Dated: September 11, 2020

Chicago, Illinois

                                    Respectfully submitted,
                                    /s/ R Tamara de Silva
                                    R Tamara de Silva (lead counsel)
                                    Cheryl Fitzpatrick-Smith
                                    Law Offices of R Tamara de Silva, LLC
                                    980 N Michigan Avenue, Suite 1400
                                    Chicago, IL 60611
                                    Tel: (866) 566- 1849
                                    Email: tamara@desilvalawoffices.com
                                            cheryl@futurescomplianceinc.com

                                    /s/ Jonathan Lubin
                                    Jonathan Lubin
                                    8800 Bronx Ave., Suite 100H
                                    Skokie, IL 60077
                                    Tel: (773) 954-2608
                                    Email: jonathan@lubinlegal.com

                                    *Counsel for Plaintiffs*

**EXHIBIT A**



# Futures Client Agreement

TD Ameritrade Futures & Forex LLC

600 W. Chicago Ave. Suite 100 ▪ Chicago, IL 60654-2597

Phone: 866-839-1100 ▪ Fax: 773-435-3232

In consideration of the agreement of TD Ameritrade Futures & Forex LLC ("TD Ameritrade Futures & Forex" or "the Firm"), a registered Futures Commission Merchant ("FCM") with the CFTC, to act as broker for the undersigned ("Client") in the purchase or sale of futures contracts and options on futures (hereinafter, "Commodity Interests"), in the Client's account for trading futures ("Account") Client agrees, in respect to all Accounts that Client now has or may at any future time have with TD Ameritrade Futures & Forex, or its successors, including Accounts from time to time closed and then reopened, as follows:

## 1. AUTHORIZATION AND ACKNOWLEDGMENTS

a. Client understands that TD Ameritrade Futures & Forex has not undertaken and will not undertake an independent evaluation of whether Commodity Interests trading or any transaction entered into by Client hereunder is appropriate for Client, and TD Ameritrade Futures & Forex is relying solely on Client's representations in this regard. All transactions effected for the Account and all fluctuations in the market prices of Commodity Interests or other property carried in the Account are at Client's risk, and Client shall be solely liable for such risks under all circumstances. Client acknowledges that Client is willing and financially able to sustain any losses resulting therefrom, and Client's unconditional obligation to pay TD Ameritrade Futures & Forex the amount of any such losses.

b. Client authorizes TD Ameritrade Futures & Forex to (i) purchase and sell Commodity Interests upon Client's oral, written, or electronic instructions; and (ii) employ any clearing broker, executing broker, or floor broker, as Client's agents in connection with the execution, clearing, carrying, delivery, and/or settlement of any such transactions. The Firm shall not be responsible to Client in any case for an executing broker's or floor broker's inability to execute orders, nor shall TD Ameritrade Futures & Forex be responsible in any way for any executing broker or floor broker selected by Client. All orders placed by Client may be executed on any exchange or other market where such business is transacted by TD Ameritrade Futures & Forex or its agent in the discretion of the Firm or such agent, deemed to be most desirable, unless otherwise instructed.

c. Client shall be bound by, and TD Ameritrade Futures & Forex may rely on and act in accordance with, any oral or written instructions which TD Ameritrade Futures & Forex believes, in good faith, to have been given by Client or an individual authorized to act on Client's behalf, including but not limited to any individual identified in writing by Client to TD Ameritrade Futures & Forex as authorized to act on Client's behalf.

d. Transactions shall be subject to the constitution, by-laws, rules, regulations, customs, and usages of the exchange or market where executed (and of its clearing house if any) and to any applicable Federal or State law, including but not limited to the provisions of the Commodity Exchange Act (the "Act"), as amended, and the rules and regulations thereunder (collectively, "Applicable Law"). TD Ameritrade Futures & Forex shall not be liable to Client as a result of any action taken by the Firm or its agent to comply with any Applicable Law. Any failure by TD Ameritrade Futures & Forex to comply with any Applicable Law shall not relieve Client of any obligations under this Agreement nor be construed to create rights thereunder in favor of Client against the Firm.

e. Client further acknowledges and agrees that: (i) Client is exercising its own judgment and decision with respect to any instructions given to TD Ameritrade Futures & Forex to execute transactions for the Account, without reliance on any information or other statements that may be made by TD Ameritrade Futures & Forex, and the Firm makes no representation or warranty as to the value, merits, or suitability of any order placed or transaction undertaken by Client; (ii) TD Ameritrade Futures & Forex shall have the right to limit the size and number of open contracts (net or gross) held in the Account, refuse the acceptance of orders for new positions, and/or require Client to reduce open positions; (iii) TD Ameritrade Futures & Forex has no fiduciary obligations to Client, and the duties and obligations of the Firm to Client are limited to those expressly set forth in this Agreement; (iv) TD Ameritrade Futures & Forex is acting solely as Client's broker in accordance with the terms of this Agreement and is not otherwise acting as an agent or a fiduciary to Client and has no discretionary authority or control over the Account; (v) the Firm has no financial or other obligations as a principal to Client under the terms of this Agreement in connection with any transaction in Commodity Interests executed, cleared, or carried by TD Ameritrade Futures & Forex for Client; (vi) TD Ameritrade Futures & Forex may, in its sole discretion, decline to accept from other brokers Commodity Interests executed by such brokers on an exchange for Client and proposed to be "given up" to the Firm for clearance or carrying in the Account; and (vii) Client will, following a request by the Firm, promptly provide to TD Ameritrade Futures & Forex copies of its latest audited financials (if applicable) and any such other financial or other information as the Firm may reasonably request.

## 2. LIEN AND SECURITY INTEREST

Client grants TD Ameritrade Futures & Forex a first lien and security interest in all monies, open positions in Commodity Interests, documents representing title to commodities such as warehouse receipts and the commodities represented thereby and any other property of Client (either individually or jointly with others) now or in the future held by the Firm in the Account or otherwise in the Firm's possession or control for any purpose, including safekeeping (collectively, the "Collateral"), to secure payment and discharge of all obligations of Client to TD Ameritrade Futures & Forex or any affiliate of the Firm, which Collateral is subject to the general lien of, and right of set-off by, TD Ameritrade Futures & Forex for any and all such obligations. Client agrees to execute any and all documents including Uniform Commercial Code financing statements, as deemed necessary or appropriate by TD Ameritrade Futures & Forex to evidence or perfect its security interest in any Collateral. Client has not granted and will not grant a security interest in the Collateral or the Account (other than the security interest granted to the Firm hereunder) to any other party without TD Ameritrade Futures & Forex's written consent. Except as prohibited by Applicable Law, all Collateral now or hereafter held or carried by the Firm for Client may, from time to time, without notice to Client, be pledged, hypothecated, loaned, or invested by the Firm to or with others, separately or with any other property. TD Ameritrade Futures & Forex shall not be required to retain in its possession for delivery a like amount of, or to pay interest or to account to Client for any profits on, such property. All transactions for or on Client's behalf may be included in a single Account whether or not such transactions are segregated on TD Ameritrade Futures & Forex records into separate Accounts, either severally or jointly with others.

TDA 600 F 03/18

## 3. AUTO SWEEP AND TRANSFERS

To open an account, Client understands that TD Ameritrade Futures & Forex requires that a Client first have an Account for trading securities ("Securities Account") with its affiliate, TD Ameritrade, Inc. established. Client understands and agrees that if available cash is held in the Account at the end of the trading day, such available cash is automatically swept from the Account held at TD Ameritrade Futures & Forex, to his or her Securities Account held at TD Ameritrade Futures & Forex's affiliate, TD Ameritrade Clearing, Inc. Regardless of where available cash is held, applicable SEC and CFTC rules require proper segregation of Client assets from firm assets. Please note that transferring available cash from the Account to a Securities Account will result in the Client not receiving preferential treatment afforded for funds held in a futures account pursuant to Part 190 of the CFTC's regulations and the U.S. Bankruptcy Code. Client funds held in a Securities Account for the purpose of purchasing securities or held in a portfolio margin account carried as a Securities Account are protected by SIPC. Client should refer to the Securities Account Client Agreement or the SIPC website, http://www.sipc.org/ for further information regarding SIPC coverage. Client may elect to not have available cash transferred from the Account to a Securities Account by contacting TD Ameritrade Futures & Forex New Account Department at 600 W. Chicago, Suite 100, Chicago, IL 60654 or via email at futuressupport@tdameritrade.com.

As permitted by applicable law, Client agrees that TD Ameritrade Futures & Forex may, in its sole and absolute discretion and without prior notice to Client, transfer excess funds or collateral from one Client Account to any other Account that Client maintains with TD Ameritrade Futures & Forex (including any of the Securities Accounts custodied by TD Ameritrade Futures & Forex's affiliate, TD Ameritrade Clearing, Inc.) in such amount as in TD Ameritrade Futures & Forex's judgement may reasonably be required to avoid margin calls or to reduce or satisfy any deficit in the account to which the funds were transferred. TD Ameritrade Futures & Forex, however, is not obligated to do so.

## 4. MARGINS

TD Ameritrade Futures & Forex shall have the right to set and revise margin requirements and to limit, without prior notice to Client, the number of positions which Client may maintain or acquire through TD Ameritrade Futures & Forex. Client will at all times maintain collateral and margin for all Accounts as from time to time may be required by TD Ameritrade Futures & Forex in its sole discretion or demanded by Applicable Law.

## 5. CLIENT OBLIGATIONS

Client agrees to pay promptly on demand any and all sums due to TD Ameritrade Futures & Forex for monies advanced including any unsecured debit balance, with interest thereon at 1% over the prime rate published in The Wall Street Journal. Client agrees to pay when due, TD Ameritrade Futures & Forex's charges for commissions at rates established between the Firm and Client and for related fees and charges as a result of, or related to, the transactions effected under this Agreement, and for other services offered and accepted in connection with the Account. Further, Client undertakes, at any time upon TD Ameritrade Futures & Forex demand, to discharge all obligations to the Firm, or, in the event of a closing of any of Accounts in whole or in part, to pay any deficiency owed, if any, including costs, damages, or attorney fees suffered or paid by TD Ameritrade Futures & Forex, directly or indirectly, in connection with such deficiency. In lieu of requiring the immediate discharge of any Client obligations, TD Ameritrade Futures & Forex may, in its sole discretion, demand security for such obligation and, if elected, for all future obligations in which event Client will either discharge all existing obligations to TD Ameritrade Futures & Forex or furnish security as the Firm demands, and, in that connection, execute and deliver such security agreements, financing statements, and other documents, informs prescribed or approved by TD Ameritrade Futures & Forex as shall be reasonably requested. Client agrees to maintain $1,500.00 Net Liquidating Value in Account at all times. TD Ameritrade Futures & Forex, without prior notice and in its sole discretion, reserves the right to raise Client's minimum Account Net Liquidating Value at any time.

## 6. LIQUIDATION OF POSITIONS

If the Account is under-margined or if TD Ameritrade Futures & Forex, in its sole discretion, determines that it is otherwise insecure with respect to Client's willingness or ability to fulfill his/her obligations hereunder, TD Ameritrade Futures & Forex may in its sole discretion and without prior notice to Client offset any of Client's open positions in Commodity Interests (including futures or options on futures) so as to eliminate such margin deficiency or insecurity, and Client shall remain liable to TD Ameritrade Futures & Forex for any loss or debit balance that results, without regard to (a) whether TD Ameritrade Futures has adhered to margin or other rules of any contract market, or (b) any other term of this Agreement. Likewise, to the extent permitted by Applicable Law, Client hereby authorizes TD Ameritrade Futures & Forex, without prior notice and in its sole discretion, to liquidate any assets held by TD Ameritrade Clearing, Inc. in a Securities Account to eliminate such margin deficiency or insecurity. This right to offset includes the right, if deemed appropriate in the exercise of the Firm's discretion, to buy and/or sell any related futures and/or options on futures or other property, including but not limited to the use of spreads, straddles, and/or off-exchange transactions, such as an exchange for physical or other cash transaction, including for the Firm's account, in order to effectuate such liquidation. It is understood that a prior demand or call or prior notice of the time and place of such sale or purchase shall not be considered a waiver of TD Ameritrade Futures & Forex's right to sell or buy without demand or notice as herein provided. Client shall remain liable for and shall pay to TD Ameritrade Futures & Forex immediately the amount of any deficiency in any Account of Client with the Firm resulting from any transaction described above. For purposes of this Client Agreement, a reasonable amount of time shall be deemed one hour or less, if in the Firm's sole discretion market conditions required that margin calls must be met in less than one hour.

## 7. LIMITATION OF LIABILITY; INDEMNIFICATION

a. Neither TD Ameritrade Futures & Forex nor its officers, directors, affiliates, and/or employees shall have any responsibility for compliance by Client with any law or regulation governing Client's conduct.

b. Neither TD Ameritrade Futures & Forex nor its officers, directors, affiliates, or employees shall be under any liability whatsoever for any loss or damage sustained by Client as a direct or indirect result of any services provided by the Firm hereunder or for any loss or damage resulting, directly or indirectly, from: (i) any failure or delay or default on the part of Client or any third party, including any custodian or exchange (including any clearinghouse), in providing accurate information or performing its functions; (ii) any event or circumstance beyond the reasonable control of TD Ameritrade Futures & Forex including, but not limited to, (A) any failure or defective performance of any communication, settlement, computer or accounting system or equipment; or (B) performance, non-performance, delays in the transmission or execution of any order due to suspension or termination of trading, the breakdown or failure of the system or of any other transmission system, electronic trading system, or communication facilities, or (C) any governmental, judicial, administrative, exchange, or regulatory or self-regulatory organization order, restriction, or ruling; (iii) strikes or similar labor action; or (iv) any reliance placed by Client on any market or other information supplied to Client by TD Ameritrade Futures & Forex, it being understood that any such information may be unverified and the Firm makes no representation or warranty as to the accuracy or

reasonableness of such information. In no event will TD Ameritrade Futures & Forex or its officers, directors, affiliates, or employees be liable hereunder to Client for consequential, incidental, or special damages, including damages for loss of profit or loss of trading opportunity.

c. In the event that TD Ameritrade Futures & Forex is a party, directly or indirectly, to any claim, dispute, or loss in connection with (i) transactions effected in the Account; (ii) Client's obligations or liabilities arising from the Account, (iii) this Agreement, (iv) Client's use of an electronic trading system of any exchange or other market, or (v) Client's violation of any third party's rights, including, but not limited to, copyright, patent, trademark, proprietary, and privacy rights, Client shall indemnify and reimburse TD Ameritrade Futures & Forex for all losses, damages, fines, penalties, and expenses incurred, including the Firm's reasonable attorney's fees and expenses. The Firm shall have the exclusive right to defend, settle, or compromise any claim or demand instituted by any third party against TD Ameritrade Futures & Forex or against the Firm and Client. Client hereby waives any and all rights Client may have independently to defend, settle, or compromise any such claims or demands and agrees to cooperate to the best of Client's ability with TD Ameritrade Futures & Forex with respect thereto, but the Firm may, in its sole discretion, authorize and require Client to defend, settle, or compromise any such claim or demand as TD Ameritrade Futures & Forex deems to be appropriate at Client's cost, expense, and liability. Client agrees to reimburse TD Ameritrade Futures & Forex on demand for any cost of collection incurred by the Firm in collecting any sums owing by Client under this Agreement and any cost incurred by the Firm in successfully defending itself against any claims asserted by Client, including all attorney's fees, interest, and expenses.

## 8. NOTICES AND CLIENT COMMUNICATIONS

a. Any notices and other communications may be transmitted to Client at the address, telephone number, or email address given herein, or at such other address or telephone number as Client hereafter shall notify TD Ameritrade Futures & Forex in writing. All notices or communications shall be deemed transmitted when telephoned, deposited in the mail, sent via facsimile, electronic transmission, or email by the Firm. Confirmations, purchase and sale statements, and account statements shall be deemed accurate unless written objection is transmitted via facsimile or email to TD Ameritrade Futures & Forex at 773.435.3232 or futuressupport@tdameritrade.com, such transmission to be made by Client immediately upon receipt of such notice.

b. **Electronic Signatures.** Client's use of electronic signatures to sign documents is legally binding in the same manner as if such documents had been manually signed. The use of an electronic version of these documents fully satisfies any requirement that they be provided in writing. If documents are signed electronically, Client represents to have the ability to access and retain a record of the documents. Client is responsible for understanding these documents and agrees to conduct business with TD Ameritrade Futures & Forex by electronic means. Client is obliged to review periodically the websites for changes or modifications.

c. **Consent.** By consenting to the electronic delivery of all information relating to my Account, Client authorizes TD Ameritrade Futures & Forex to deliver all communications by the following means: (1) by email at the email address specified by Client; (2) by posting the communication on the websites or other sites on the Internet where the communication can be read and printed; (3) by sending Client an email that includes a hyperlink to the websites or an address on the Internet where the information is posted, and can be read and printed; and (4) by sending Client a notice that directs Client to an address on the Internet or a place within the websites where the communication is posted and from which it can be read and printed. Such delivery will be an effective delivery to Client for the purposes of any Applicable Rules whether or the communications are accessed or reviewed. Although Client consents to electronic delivery, TD Ameritrade Futures & Forex may elect to deliver communications by other means which shall not affect Client's consent. Client agrees to notify TD Ameritrade Futures & Forex of any change in address. Client may revoke his consent to electronic delivery at any time and should contact TD Ameritrade at 866-839-1100 option 4 or futuressupport@tdameritrade.com to do so.

## 9. COMMUNICATION DELAYS

TD Ameritrade Futures & Forex shall not have any liability to Client for delays in the transmission, clearance, or confirmation of Client's orders due to mechanical, electronic, or computer failure or market congestion or illiquidity, or other causes beyond its control, nor shall it be liable for improper execution, clearance, or confirmation of Client's orders by persons who are not employees of TD Ameritrade Futures & Forex. The price at which an order is executed shall be binding notwithstanding the fact an erroneous report is made. An order, which was executed but in error reported as not executed, shall be binding. TD Ameritrade Futures & Forex shall have no liability to Client arising out of (a) Client's use of or reliance on information provided directly or indirectly through TD Ameritrade's website, whether in the nature of quotations or otherwise, (b) futures transactions not cleared through the Firm, or (c) Client's access to or use of third party websites (or other resources) linked to or otherwise incorporated into or referenced within TD Ameritrade's website.

## 10. ELECTRONIC TRADING

a. Client acknowledges that all orders, whether placed through the Firm's system, through a floor broker or otherwise, are at Client's sole risk. Client shall be solely responsible for all orders entered or attempted to be entered through Client's identifiers. Acceptance of an order for placement does not constitute an agreement or representation by TD Ameritrade Futures & Forex that there is sufficient margin in the Account to support the resulting position. Client acknowledges that the Firm may set minimum net liquidating equity for the Account. Client hereby acknowledges Client's responsibility to keep apprised of current margin requirements in connection with all trading activities, agrees to post all required margin for trades ordered by Client, and agrees to be liable for the losses incurred on all trades ordered by Client, regardless of whether there is sufficient margin posted when the trade is ordered.

b. Under no circumstances shall TD Ameritrade Futures & Forex or any other FCM with whom the Firm has an omnibus or other clearing relationship have any responsibility or liability to Client in the event that, whether because of electronic or other mechanical failure, system failure or delay, acts of God or terrorism, or any other reason, (a) Client is unable to access or use the website or trading software, whether to place an order, receive Account related information, or otherwise engage in any futures related activities, or (b) any exchange or clearing corporation sustains any mechanical, electrical or other failure, delay, interruption, or congestion, whether or not such results in a failure to maintain an orderly market, failure or delay in the execution, clearance, or confirmation of futures transactions for the Account or otherwise. To reduce costs and increase the efficiency in confirming Client's trades and reporting Account data to Client, Client consents to delivery of all his daily statements and margin calls (collectively, "statements") by email, instead of hard copy, to the email address provided by Client. Client acknowledges that some electronic markets permit continuous trading and that access to those markets may not be provided by TD Ameritrade Futures & Forex. Under no circumstances shall TD Ameritrade Futures & Forex bear any liability to Client for any losses that may result from the inability to access markets due to such restrictions. Client shall bear sole responsibility for the cancellation of all unexecuted day orders that can be executed during market hours for which access is not provided by TD Ameritrade Futures & Forex. If TD Ameritrade Futures & Forex believes that execution or attempted execution of any Client order might contravene any Applicable Law or violates the Firm's internal policies, TD Ameritrade Futures & Forex, in its sole discretion, may delay or refuse to execute any order to purchase or sell Commodity Interests for the Account, at any time, and from time to time.

TDA 600 F 03/18

## 11. EXERCISES, ASSIGNMENTS, AND DELIVERIES

With regard to options transactions, Client understands that some exchange clearing houses have established exercise requirements for the tender of exercise instructions and that options will become worthless if Client does not deliver instructions by such expiration times. At least two business days prior to the last trading day in the case of long and short positions in options, Client will give TD Ameritrade Futures & Forex instructions to liquidate, exercise, or allow the expiration of such options, and will deliver to the Firm sufficient funds required in connection with exercise. If such instructions or such funds are not received by TD Ameritrade Futures & Forex prior to the expiration of the option, TD Ameritrade Futures & Forex may permit an option to expire. Client also understands that certain exchanges and clearing houses automatically exercise some "in-the-money" options unless instructed otherwise. Client acknowledges full responsibility for taking action either to exercise or to prevent exercise of an option contract, as the case may be. TD Ameritrade Futures & Forex is not required to take any action with respect to an option, including without limitation any action to exercise a valuable option contract prior to its expiration or to prevent the automatic exercise of an option, except upon Client's express instructions. Client further understands that the Firm may also establish exercise cut-off times, which may be different from the times established by the contract markets or clearing houses. If timely exercise and assignment instructions are not given, Client hereby agrees to waive any and all claims for damage or loss Client might have against TD Ameritrade Futures & Forex arising out of the fact that an option was or was not exercised. Client understands that TD Ameritrade Futures & Forex, or its agents, randomly assign exercise notices to Clients, that all short option positions are subject to assignment at any time, including positions established on the same day that exercises are assigned, and that exercise assignment notices are allocated randomly from among all Clients' short option positions which are subject to exercise. With regard to futures transactions, liquidating instructions on open positions in a current delivery month must be given to TD Ameritrade Futures & Forex at least five business days prior to the first notice day in the case of long positions, and at least five business days prior to the last trading day in the case of short positions. TD Ameritrade Futures & Forex does not allow for futures contracts to be settled with physical delivery of a commodity nor does TD Ameritrade Futures & Forex allow for positions to be held on or after First Notice Day. Client is required to close or roll Client's positions to the next active month prior to First Notice Day. While any positions can be liquidated at the discretion of the TD Ameritrade Futures & Forex Risk Department at any time and without prior notice, open positions (regardless of whether they are long or short) in physically delivered products will be liquidated before First Notice Day or Last Trade Date, whichever occurs first. If funds, documents, or instructions are not received, TD Ameritrade Futures & Forex may, without notice, close out such positions without additional prior notification. TD Ameritrade Futures & Forex shall have no liability to Client for any such action. In the event of an error, omission, or out trade discovered on or after the last day of trading, TD Ameritrade Futures & Forex will abide by the appropriate Exchange rules for an Alternative Delivery Procedure (ADP).

## 12. POSITION LIMITS

In addition to compliance with any position limits that TD Ameritrade Futures & Forex may impose hereunder, Client agrees to comply with any applicable position limits that may be established by the CFTC, other applicable regulators or the rules of any exchange or self regulatory organization, whether Client is acting alone or in concert with others.

## 13. FOREIGN CURRENCY CONVERSIONS

Client will make all deposits in U.S. dollars except as otherwise permitted by TD Ameritrade Futures & Forex. Unless another currency is designated in the confirmation for such transaction, all margin deposits for such contract and any debit or credit made in the Account as a result of liquidating such a contract shall be in U.S. dollars at a rate of exchange determined by the Firm in its sole discretion on the basis of the then prevailing rates of exchange for such foreign currency. If Client places any order that would be settled in a currency other than U.S. dollars or otherwise instructs the Firm to enter into any transaction to be denominated in a currency other than U.S. dollars, then: (a) Client shall be deemed to have authorized the Firm to convert funds to the applicable currency sufficient to meet the applicable margin requirement; (b) the exchange rate for such conversion shall be determined by the Firm on the basis of then-prevailing rates of exchange and the Firm may retain a fee for such conversion; and (c) any profit or loss arising as a result of a fluctuation in the exchange rate affecting such currency shall be for the Account and at the Client's risk. In no event shall TD Ameritrade Futures & Forex be required to effect, or be responsible for, the conversion of funds in anticipation of changes in prevailing rates of exchange. Where applicable, Client shall be deemed to have authorized the holding of funds outside of the U.S., a money center country (as defined in CFTC Rule 1.49), or in a country other than the currency's country of origin if Client fails to object when informed (by receipt of confirmation or otherwise) that funds are held in such jurisdiction.

## 14. INDIVIDUAL ACCOUNT

a. If this is an Individual Account, or Individual Retirement Account ("IRA"), Client represents that this is an Individual or Sole Proprietorship Account and no one else has an interest in the Account.

b. If this is an IRA established under Section 408(a) of the Internal Revenue Code of 1986, as amended ("Code"), or an account of a Roth IRA established under Section 408A of the Code (each, an "IRA"), the undersigned person represents that he or she is the beneficial owner of the IRA, which is the Client hereunder, and has authority: (1) to give any instructions with respect to the account; (2) to receive any demands, notices, confirmations, reports, statements, and other communications of any kind; (3) to sign any other documents related to the opening or maintenance of this account; and (4) generally to deal with TD Ameritrade Futures & Forex in connection herewith as fully and completely as if the trustee or custodian of the IRA had no interest herein.

## 15. JOINT ACCOUNT

If this is a Joint Account, each Client agrees that liability shall be joint and several. Each Client shall have authority: (1) to give any instructions with respect to the Account; (2) to receive any demands, notices, confirmations, reports, statements, and other communications of any kind; (3) to sign any other documents related to the opening or maintenance of the Account; and (4) generally to deal with TD Ameritrade Futures & Forex in connection herewith as fully and completely as if the other joint tenant or tenants had no interest herein. Notwithstanding the foregoing, TD Ameritrade Futures & Forex is authorized to require joint action by the joint tenants on an Account. TD Ameritrade Futures & Forex shall be under no duty or obligation to inquire into the purpose or propriety of any instruction given and shall be under no obligation to see to the application of any funds so delivered.

## 16. NOTIFICATION OF RECORDING

TD Ameritrade Futures & Forex is hereby granted permission to record telephone conversations between its representatives and Client.

TDA 600 F 03/18

## 17. BINDING EFFECT; AMENDMENTS

This is the entire agreement of the parties governing the Account, and supersedes all prior or contemporaneous agreements between Client and TD Ameritrade Futures & Forex concerning the Account. TD Ameritrade Futures & Forex reserves the right to amend this Agreement without prior notice to Client, or as required by Applicable Law. The current version of the Agreement will be posted electronically and Client's continued account activity after such amendment constitutes the Client's agreement to be bound by all amendments to the Agreement, regardless of whether the Client reviews them. No person has the authority to represent that this Agreement will not be enforced in accordance with its terms or to make any representation inconsistent with the terms of the Risk Disclosure for Futures and Options and the Risk Disclosure Statement concurrently delivered to Client. TD Ameritrade Futures & Forex's failure to insist on Client's strict adherence to the terms hereof shall not act as a waiver of its rights to so insist at any time thereafter, all such rights being cumulative and unconditional in nature.

## 18. CLIENT REPRESENTATIONS

Client represents and warrants that: (a) Client has the legal authority and is duly authorized and empowered to execute and deliver this Agreement and to open Accounts and effect transactions in Commodity Interests through TD Ameritrade Futures & Forex, such transactions do not and will not violate any Applicable Law, or any judgment, decree, order, or agreement, to which Client or the Client's property is subject, and this Agreement is binding on and enforceable against Client in accordance with its terms; (b) Client is under no legal disability which would prevent client from trading in Commodity Interests or entering into this Agreement and that all of the information contained in the Account Application is true, complete, and correct as of the date hereof; (c) Client is not an associated person, general partner, employee, or otherwise associated with another FCM or IB under CFTC Regulation 155.3(c); (d) If Client directs TD Ameritrade Futures & Forex to execute block trades, Client represents that it is an eligible contract participant as defined by the Commodity Exchange Act and the CFTC; (e) client will promptly notify TD Ameritrade Futures & Forex in writing of any changes in such information or any change in circumstances which would affect the representations and information given to the Firm or which would in any way affect Client's ability to make any transactions contemplated by or render performance under any term of this Agreement; (f) if Client is an individual, he or she is of majority age, and that he or she is not an employee or a member of any exchange (nor of any corporation of which any exchange owns a majority of the capital stock) nor of a firm registered on any exchange, or if he or she is so employed that a written consent of his or her employer is attached herewith; and (g) Client will notify TD Ameritrade Futures & Forex in writing to liquidate all open Commodity Interest positions in and close his Account if losses therein approach the extent at which the lifestyle of Client or any dependent of Client may become adversely affected.

## 19. CONSENT TO CREDIT CHECK; ANTI-MONEY LAUNDERING PROVISIONS

Client understands an investigation may be made pertaining to his credit standing and his business accounts, and authorizes TD Ameritrade Futures & Forex to contact such banks, financial institutions, and credit agencies as the Firm shall deem appropriate. Client acknowledges that any Account established pursuant to this Agreement shall be subject to anti-money laundering requirements established by applicable government agencies or self-regulating organizations. Accordingly, Client shall promptly provide any documents or certifications requested by TD Ameritrade Futures & Forex that the Firm believes are necessary or advisable to obtain for anti-money laundering compliance purposes.

## 20. ASSIGNABILITY

Client's rights and duties hereunder may not be assigned other than with the written consent of TD Ameritrade Futures & Forex. Client agrees that TD Ameritrade Futures & Forex may assign this Agreement to another FCM upon notice to Client and otherwise in accordance with Applicable Law.

## 21. INTERPRETATION

These section headings are for convenience of reference only and shall not affect the meaning or construction of any provision of this Agreement. If any provision of this Agreement shall be determined to be invalid or unenforceable, the remainder shall not be affected thereby.

## 22. GOVERNING LAW

This Agreement and its enforcement shall be governed by the laws of the State of Nebraska without regard to the conflicts of law provision thereof. No lawsuit, arbitration proceeding, or other claim, regardless of form, arising out of transactions under this Agreement may be brought by Client more than one year after the cause of action arose. Provided, however, that any action brought under the provisions of Section 14 of the Act, may be brought at any time within two years after the cause of action accrues.

## 23. ACKNOWLEDGMENT OF DISCLOSURES

CLIENT HEREBY UNDERSTANDS THE FUTURES CLIENT AGREEMENT AND CONSENTS AND AGREES TO ALL OF THE TERMS AND CONDITIONS OF AGREEMENT SET FORTH ABOVE. CLIENT ACKNOWLEDGES THAT TRADING IN COMMODITY INTERESTS IS SPECULATIVE, INVOLVES A HIGH DEGREE OF RISK, AND IS APPROPRIATE ONLY FOR PERSONS WHO CAN ASSUME RISK OF LOSS IN EXCESS OF THEIR MARGIN DEPOSIT. CLIENT EXPRESSLY ACKNOWLEDGES THAT IT HAS RECEIVED, READ, AND UNDERSTANDS, AND HAS RETAINED COPIES OF CFTC RULE 1.55 RISK DISCLOSURE STATEMENT FOR FUTURES AND OPTIONS. CLIENT ALSO UNDERSTANDS THAT TD AMERITRADE FUTURES & FOREX IS RELYING ON CLIENT TO BE FAMILIAR WITH ANY DISCLOSURES RELATED TO THIS ACCOUNT THAT ARE OR MAY BECOME APPLICABLE.

Investment Products: Not FDIC Insured * No Bank Guarantee * May Lose Value

TD Ameritrade Futures & Forex LLC, member NFA. Securities brokerage services provided by TD Ameritrade, Inc., and TD Ameritrade Clearing, Inc., members FINRA/SIPC. TD Ameritrade is a trademark jointly owned by TD Ameritrade IP Company, Inc. and The Toronto-Dominion Bank. © 2018 TD Ameritrade.

TDA 600 F 03/18

**EXHIBIT B**



# Client Agreement

PO Box 2760 ■ Omaha, NE 68103-2760
Fax: 866-468-6268

## 1. INTRODUCTION

This Agreement governs all brokerage accounts that I open with you, all transactions in my Account, the use of your websites, the Brokerage Services, the TD Ameritrade Content, and the Third-Party Content; is binding on my heirs, executors, administrators, successors, and assigns; and will inure to the benefit of your successors. By opening an Account with you, I acknowledge that I have received, read, and understand this Agreement and agree to be bound by its terms. Accounts opened with the TD Ameritrade Institutional Division are governed by a separate agreement.

"I," "me," "my," or "account owner" means each account owner who signs the Account Application. "You," "Your," or "TD Ameritrade" means TD Ameritrade, Inc., a wholly owned subsidiary of TD Ameritrade Holding Corporation, and, when applicable, TD Ameritrade Clearing, Inc. ("Clearing"), TD Ameritrade's clearing broker-dealer.

## 2. DEFINITIONS

**"Account"** means each brokerage account I open with you or have an interest in.

**"Agreement"** means these terms and conditions as well as any supplemental agreements and disclosures that apply to my Account, as amended from time to time.

**"Applicable Rules"** means all applicable federal and state laws, rules and regulations, rules of any self-regulatory organization, and the constitution and applicable rules, regulations, customs, and usages of the exchange or market and its clearinghouse.

**"Brokerage Services"** means your website and related services that you provide other than TD Ameritrade Content, which I need to place trades in my Account.

**"Business Day"** means Monday through Friday, excluding market holidays.

**"Services"** means, collectively, the websites, the Brokerage Services, the TD Ameritrade Content, and the Third-Party Content. This Agreement applies to the Services provided by you regardless of how I access them (for example, in person, phone, Internet, or by mobile device).

**"TD Ameritrade Content"** means all information, tools, and services available on your website, other than Brokerage Services provided by you, and not by a third party.

**"Third-Party Content"** means all information, tools, and services available on your website that are provided by a third party ("Third-Party Provider"), including financial and investment tools, market data, reports, alerts, calculators, access to online conferences, telecasts, bulletin boards, tax preparation, or account management tools.

**"websites"** means the Internet sites of TD Ameritrade, whose domain name is registered as http://www.tdameritrade.com, and others, and through which you offer Services.

## 3. MY ACCOUNT AND RELATIONSHIP WITH YOU

**a. Self-Directed Account.** I understand that Accounts opened with you are self-directed. I am responsible for all purchase and sell orders, decisions to continue with an investment strategy or to hold an investment, and instructions placed in my Account. Unless you provide advice to me that is clearly identified by you as an individualized recommendation for me, any investment decision that I make or investment strategy that I utilize, including the decision to hold any and all of the securities or derivatives in the Account, is based on my own investment decisions or those of my agent and is at my own risk. All investments involve risk, and unless you provide individualized recommendations to me, I or my agent are responsible for determining the suitability of any trade, investment, investment strategy, and risk associated with my investments. TD Ameritrade Content or Third-Party Content I access through you does not constitute a recommendation to invest in any security or derivative, or to utilize any investment strategy.

**b. Fees and Commissions.** I will pay commissions, charges, taxes, and other fees applicable to my Account. Current commission pricing and other fees are on the websites. You may change your fees and commissions at any time by posting changes on the websites or by other means.

You reserve the right to vary commissions among clients in connection with special offers or combinations of services or in other circumstances. You or Clearing may pay a portion of the revenues or fees derived from servicing my Account to third parties that provide services to you or Clearing. If my Account is an IRA or other retirement plan account, my Account may be charged fees that the particular plan has authorized to be paid to service providers other than you or Clearing.

**c. Statements and Confirmations.** It is my obligation to review trade confirmations and Account statements promptly upon receipt. These documents will be considered binding on me unless I notify you of any objections within five days from the date confirmations are sent and within 10 days after Account statements are sent.

**d. Instructions.**

1. General. You may accept and act on instructions from me, my agent, or any person authorized on my Account. You may refuse any order, or delay placing any order, if you determine that an order requires clarification from me. I will not hold you responsible for any losses caused by the rejection or delay. You will not receive any order or instruction transmitted by my agent or me until you have actual knowledge of the order or instruction. You do not determine the validity of my agent's status or capacity, the appropriateness of, or the authority or actions by such person.

2. Wire Transfers. By initiating a wire transfer from my Account with or without a letter of instruction, I agree that you may use security procedures for accepting and acting upon wire transfer instructions. I agree that such security procedures may include one, some, or all of the following, depending on the type, amount, and frequency of the wire transfer request: requestor and/or account owner identification and verification; requestor and/or account owner signature comparison or verification; confirmation of receiving bank and/or account designation; notice provided via email, message center, or phone to account owner and/or authorized agent; account surveillance and/or trending analysis. In some circumstances, you may place limits on the portability of funds and additional documentation may be required.

AMTD 182 F 06/20

I agree that the above security procedures are commercially reasonable under the circumstances. I agree to be bound by instructions to initiate a wire transfer, with or without a letter of instruction, whether in fact authorized or unauthorized, which you implement in compliance with these procedures, unless I have given you prior notice of possible unauthorized activity in my Account and you have a reasonable opportunity to act on such notice.

3. ACH Transactions. From time to time, originators that I authorize may send ACH credits or debits to my account. For each ACH transaction, I agree it is subject to the NACHA Operating Rules and Guidelines or other funds transfer system rules as applicable, and that the following additional terms shall apply: (1) TD Ameritrade's payment of a funds transfer to my account will be provisional until TD Ameritrade receives final settlement or payment, and I agree that TD Ameritrade may reverse the provisional credit and/or obtain reimbursement from me if you do not receive final settlement or payment; (2) A payment by the beneficiary's bank of a funds transfer from my account to the beneficiary will be provisional until final settlement has been made or until payment is considered received under applicable law, and I agree that the beneficiary's bank may reverse its provisional credit and obtain a refund from the beneficiary and I, as the originator of the payment, will not be considered to have paid the beneficiary; (3) I hereby authorize any Originating Depository Financial Institution (ODFI) to initiate, pursuant to ACH operating rules, ACH debit entries to my account for electronic presentation or re-presentment of items written or authorized by me; and (4) If I receive an unauthorized debit, I will need to file a written unauthorized debit statement with TD Ameritrade by contacting TD Ameritrade at 1-800-669-3900

**e. No Endorsement of Day Trading Strategy.** You do not recommend, endorse, or promote a "day trading" strategy, which may involve significant financial risk to me.

**f. Clearing Agreement.** You and Clearing have entered into a clearing agreement in which Clearing is the clearing agent for securities transactions for your clients. You transmit client instructions to Clearing which causes such instructions to be executed. Clearing carries my Account on a fully disclosed basis. All securities, dividends, and proceeds will be held at Clearing unless otherwise instructed.

**g. Account Protection.** You are a member of the Securities Investor Protection Corporation ("SIPC"), which protects securities customers of its members up to $500,000 (including $250,000 for claims for cash). An explanatory brochure is available on request at sipc.org. Additionally, you provide each client $149.5 million worth of protection for securities and $2 million of protection for cash through supplemental coverage provided by London insurers. In the event of a brokerage insolvency, a client may receive amounts due from the trustee in bankruptcy and then SIPC. Supplemental coverage is paid out after the trustee and SIPC payouts and under such coverage each client is limited to a combined return of $152 million from a trustee, SIPC, and London insurers. The TD Ameritrade supplemental coverage has an aggregate limit of $500 million over all customers. This policy provides coverage following brokerage insolvency and does not protect against loss in market value of the securities.

To obtain information about the SIPC, including the SIPC brochure, I can contact the SIPC at:

Securities Investor Protection Corporation
805 15th St, N.W., Suite 800
Washington, D.C. 20005-2215

Tel: 202-371-8300
Fax: 202-371-6728
Email: asksipc@sipc.org
Website: sipc.org

**h. Beneficiary Designation.** Changes in the relationship between the account owner and designated beneficiary (such as, marriage, divorce, or adoption) will not automatically add or revoke beneficiary designations. For example, if an account owner designated a spouse as beneficiary and they subsequently divorced, the former spouse will remain beneficiary on the Account unless the account owner submits a new beneficiary designation to you.

**i. Compliance with Laws.** I agree to comply with all laws, rules, and regulations applicable to my Account.

## 4. ABOUT ME

**a. Legal Capacity.** I am of legal age in the jurisdiction in which I reside and have the capacity and authority to enter into this Agreement.

**b. Accuracy of Information.** All the information I provide you is true and correct. I will promptly notify you in writing within 10 Business Days after any change in such information. You may rely upon all information I provide.

**c. Interest in Account.** I represent that no one except me (us) has an interest in any of my (our) Account(s) (unless I am opening the Account as a fiduciary).

**d. Multiple Owners.** If there is more than one Account owner, then the provisions of the Agreement apply to each owner. Accounts of husbands and wives in community property states will be held in the name of husband and wife as community property unless we instruct you otherwise; any other Joint Account will be held jointly with rights of survivorship unless I notify you of a different form of ownership and provide such documentation as you require. You will have no liability for any loss that may arise due to taking instructions from one owner or requiring instructions from all owners. If I am married, I may establish an account with my spouse as tenants by entirety. I will notify you if I become legally divorced.

**e. Rights, Terms, and Obligations of Securities in Account.** Except as required by Applicable Rules, you are not obligated to notify me of any events involving my securities positions, nor do you have the responsibility to take any actions on my behalf with respect to such events without specific instructions from me. I am responsible for knowing the rights, terms, and obligations of securities in my Account and for monitoring the occurrence of any events involving my securities positions or securities for which I intend to place an order.

## 5. PRIVACY AND CONFIDENTIALITY

**a. Privacy.** You will take reasonable measures to protect the privacy and confidentiality of information in your possession about my Account and me. Your Privacy Statement explains how you collect and protect my information. The Privacy Statement is incorporated into this Agreement by reference.

**b. Account Number, PIN, or Password.** I will receive a password and/or access number (collectively "PINs") that provides electronic access to my Account. Account numbers, User IDs, and PINs are confidential, and I am responsible for the confidentiality, protection, and use of them. Subject to the TD Ameritrade Asset Protection Guarantee, I agree to be responsible for all activities in my Account. You may be assured that I have authorized any orders or instructions that are received under my Account number and PIN or by initiating an electronic transfer of funds, with or without a letter of instruction.

**c. TD Ameritrade Asset Protection Guarantee.** If I lose cash or securities from my Account due to unauthorized activity, you will reimburse me for the cash or securities I lose. You promise me this protection if unauthorized activity causes losses and you determine it was through no fault of my own. You promise me this protection if I do four things: (1) keep my personal identifying information and Account information secure and confidential—because sharing my User ID, password, PIN, Account number, or other standard means of authentication with other people means I authorize them to take action in my Account;

(2) keep my contact information up-to-date with you, so that you can contact me in case of suspected fraud; (3) review my Account frequently and my statements promptly and report any suspicious or unauthorized activity to you immediately in accordance with this Agreement; and (4) take the actions you request and cooperate with any investigation. I agree that unauthorized activity does not include any actions or transactions undertaken by or at the request of me, my investment advisors or family members, or anyone else whom I have allowed access to my Account or to my Account information for any purpose, such as trading securities, writing checks, or making withdrawals or transfers.

**d. Phone Conversations and Electronic Communications.** You may record and monitor any telephone, video, or electronic communications with me.

**e. Credit Reports.** I authorize you to request my credit reports to verify my creditworthiness and to provide information to credit agencies. Upon request, you will inform me whether a report was requested and provide me with the name and address of the credit-reporting agency that furnished the report. Negative credit information may be submitted to a credit-reporting agency if I fail to fulfill the terms of my credit obligations.

**f. Disclosure of Account Information to Third Parties.** Consistent with your Privacy Statement, you and your agents are specifically authorized to disclose information about my Accounts and me to third parties.

**g. Trusted Contact Authorization.** If I elect to provide Trusted Contact information to you, you are authorized to communicate, verbally and in writing, with the Trusted Contact Person(s) named on the applicable Trusted Contact Authorization Form, or by other such means as I may provide Trusted Contact information to you. I understand that any communication with the Trusted Contact Person(s) may include information about any of the Account Owners, the account for which the Trusted Contact information was provided, any other accounts at TD Ameritrade in which any of the Account Owners has an interest, or any other information the Account Owners may have provided to TD Ameritrade.

I understand that you may contact the Trusted Contact Person(s) for the following reasons: (1) if there are questions or concerns about my whereabouts or health status; (2) if you suspect that I may be a victim of fraud or financial exploitation; (3) if you suspect that I might no longer be able to handle my financial affairs; (4) to confirm the identity of any legal guardian, executor, trustee, authorized trader, or holder of a power of attorney; or (5) if you have any other concerns or are unable to contact me about my Account(s) held with you. If my Account is an Entity or other Non-natural person Account, you may also contact any Authorized Agent named on the Account for the foregoing reasons.

I further agree that: (1) the Trusted Contact Authorization does not impose any obligation that you communicate with my Trusted Contact Person(s); (2) the Trusted Contact Authorization does not authorize the Trusted Contact Person(s) to make any investment decisions or transact any business with you on my behalf; (3) the Trusted Contact Authorization is optional and I may change or withdraw it at any time by notifying you in writing; (4) all named Trusted Contact Person(s) are 18 years of age or older; (5) if there are multiple Account Owners, you are authorized to follow the instructions of any one or more Account Owners in adding a Trusted Contact, and you will not be held liable for information shared with a Trusted Contact, without regard to which Account Owner(s) authorized the addition of the Trusted Contact; and (6) you are released and discharged from all claims, causes of action, damages, losses, expenses, costs, and liabilities of any kind that may arise out of, relate to, or are in connection with the release of, or failure to release, personal and/or account information to the Trusted Contact Person(s).

## 6. CLIENT COMMUNICATIONS

**a. Addresses.** You may send communications to the mailing address, email, telephone number, or facsimile number that I provide. You also may deliver information verbally or via the Secure Message Center on your website. Communications shall be deemed delivered to me whether or not I actually receive them.

**b. Electronic Signatures.** My use of electronic signatures to sign your documents legally binds me in the same manner as if I had manually signed. The use of an electronic version of these documents fully satisfies any requirement that they be provided to me in writing. If I sign electronically, I represent that I have the ability to access and retain a record of the documents. I am responsible for understanding these documents and agree to conduct business with you by electronic means. I am obliged to review periodically the websites for changes or modifications.

**c. Consent.** By consenting to the electronic delivery of all information relating to my Account, I authorize you to deliver all communications to me by the following means: (1) by email at the email address specified by me; (2) by posting the communication on the websites or other sites on the Internet where the communication can be read and printed; (3) by sending me an email that includes a hyperlink to the websites or an address on the Internet where the information is posted, and can be read and printed; and (4) by sending me a notice that directs me to an address on the Internet or a place within the websites where the communication is posted and from which it can be read and printed. Such delivery will be an effective delivery to me for the purpose of any Applicable Rules whether or not I access or review the communication. Although I consent to electronic delivery, you may elect to deliver communications by other means which shall not affect my consent. I will notify you of any change in my address. I may revoke my consent to electronic delivery of communications and receive documents on paper. You have a reasonable period to effect such a change and may charge a reasonable fee for sending paper copies.

**d. Equipment.** If I agree to electronic delivery, I must have a computer with Internet access, an email address, and the ability to download and save or print communications to retain for my records. I am responsible for obtaining and maintaining all equipment and services required for online access of my Account.

## 7. ELECTRONIC SERVICES

**a. Availability.** You do not guarantee that any media will be available to me at a particular time. Access to the websites may be limited or unavailable during periods of peak demand, market volatility, system upgrades, or other reasons.

You reserve the right to suspend and deny access to the Services, without prior notice or for any reason. I recognize that Account activity may be conducted through several different media (for example, Interactive Voice Response phone system [IVR] and phone); and if a certain medium is not available, I will use another medium to conduct Account activity. You will not be liable for the unavailability, delay, or failure of any of the media at any particular time or for the accessibility of, transmission quality, outages to, or malfunction of any telephone circuits, computer system, or software.

**b. Use of Services.** I will use the Services for lawful purposes, for my personal and noncommercial use, and as permitted by this Agreement. I will not transmit through the websites any material that violates or infringes in any way upon the rights of others or would encourage conduct that may give rise to civil or criminal liability. I will not modify, copy, publish, transmit, license, participate in the transfer or sale of, reproduce, create derivative works from, distribute, redistribute, display, or in any way exploit the Services. I will not upload, post, decompile, reverse engineer, disassemble, modify, copy, distribute, transmit, reproduce, republish, license, display, sell or transfer, or create derivative products from the Services. Software accessed on the websites is subject to U.S. export controls and may not be downloaded by any person prohibited from doing so by Applicable Rules.

I may download software on a single computer for personal, noncommercial use, provided I keep intact all copyright and other proprietary notices. You and Third-Party Providers reserve the right to revise, modify, change, upgrade, suspend, impose limitations or restrictions on, deny access to, remove, or discontinue the Services at any time without prior notice. Third-Party Providers may enforce this Agreement against me and take action against me for my breach of this Agreement.

**c. Limitation of Liability.** The Services are provided "as is" and "as available." You, your affiliates, the Third-Party Providers and their respective licensors, employees, distributors, or agents make no representations with respect to the system and expressly disclaim all warranties. Subject to Applicable Rules, in no event will you, your affiliates, the Third-Party Providers or their respective licensors, employees, distributors, or agents be liable to me or any third party for any direct, indirect, incidental, special, punitive, or consequential losses or damages of any kind with respect to the Services.

I am solely responsible for my investment research, and neither you nor any Third-Party Provider make any representations, warranties, or other guarantees as to the accuracy or timeliness of any market data; nor do you or any Third-Party Provider make any representations, warranties, or other guarantees as to the present or future value or suitability of any sale, trade, or other transaction involving any particular security or any other investment.

**d. Intellectual Property.** My use of the Services will not confer any title, ownership interest, or intellectual property rights to me. The Services are protected under U.S. patent, copyright laws, international treaties or conventions and other laws, and will remain the exclusive property of you or Third-Party Providers. Company names, logos, and all related product and service names, design marks, and slogans of you or your affiliates or any Third-Party Provider are the property of the respective company. I am not authorized to use any such name or mark in any advertising, for publicity, or in any other commercial manner.

**e. Cookies.** You use cookies on websites and my browser will need to accept all cookies for it to perform fully. Certain features of the websites may also require the acceptance of cookies.

**f. Hyperlinks.** The websites may include hyperlinks to websites, owned or operated by affiliated or unaffiliated third parties. Neither you nor Third-Party Providers are responsible for the content or availability of such other websites, and shall not be responsible or liable for any loss in connection with reliance on such sites.

## 8. BROKERAGE SERVICES

**a. Order Routing and Executions.** Unless I specify the market for execution, you decide where to route my orders for execution. You consider a wide variety of factors in determining where to direct my orders, such as execution price, opportunities for price improvement (which is when an order is executed at a price that is more favorable than the displayed national best bid or offer), market depth, order size and trading characteristics of the security, efficient and reliable order handling systems and market center service levels, speed, efficiency, accuracy of executions, and the cost of executing orders at a market. If I instruct you to route my order to a particular market for execution ("Direct Routing"), and you accept my order and instruction, you are not required to make a best execution determination beyond executing the order promptly and in accordance with the terms of my order. Instructions to direct my order to certain market centers could incur additional fees.

**b. Deposit and Order Refusal; Account Restrictions.** You reserve the right to not accept the deposit of funds or particular securities into my Account and may refuse any of my orders. You also reserve the right to place trading, disbursement, and other restrictions on my Account. You may restrict my Account from withdrawals or trading if there is a reasonable suspicion of fraud, diminished capacity, inappropriate activity, or if you receive reasonable notice that the ownership of some or all of the assets in my Account is in dispute. I will not hold you liable for any loss I may incur due to your refusal to permit any deposit, withdrawal, or transaction.

**c. Trade Execution and Price.** You route orders to markets for prompt execution in view of prevailing market conditions, but there can be delays in the processing of orders. I understand and agree with the following:

- The quoted price may not reflect the trading activity from all markets.

- High volumes of trading at the market open or intraday may cause delays in executions and result in prices significantly different from the price quoted at the time the order was entered.

- Markets may handle orders manually and may reduce size guarantees during periods of volatility, resulting in possible delays in order execution, and losses.

- The execution price I receive may be impacted by numerous factors beyond your control and responsibility, including the type of security, liquidity, and the size of my order. For example, large or "block" orders or orders involving illiquid securities may take additional time to execute and may execute at prices significantly different from the quoted price.

- The execution of market and stop-market orders may be at a price significantly different from the quoted price of that security. Limit orders will be executed only at a specified price or better, but there is the possibility that the order will not be executed.

- Securities traded in over-the-counter bulletin board and pink sheet securities and other thinly traded securities present particular trading risks in that they are often more volatile and generally less liquid than securities traded on exchanges. You reserve the right to place restrictions on the trading of such securities without prior notice.

- I may suffer market losses during periods of volatility in the price and volume of a particular stock when systems issues result in an inability to place buy or sell orders.

**d. Payment for Order Flow.** You may receive remuneration from markets for directing orders to them. The source and amount of these payments are available upon written request. Markets may act as principals to buy, sell or hold securities for their own accounts, and they may make money when executing your trade.

**e. Payment for Transactions.** All orders that I authorize will be processed with the understanding that I will pay for any purchase and deliver certificates to cover all sales on or before the settlement date. All sell orders that I place will be for securities that I own ("long") and in deliverable form at the time I place the order, unless I inform you otherwise.

You reserve the right to require full payment, or an acceptable equity deposit, prior to the acceptance of any order. I will have the required cash, available funds, or equity in my Account prior to the execution and/or settlement of a purchase or short sale transaction, and the required securities in my Account prior to the execution and/or settlement of a long sale. If I do not have sufficient funds or securities in my Account, you have the right to liquidate or buy in securities at my expense, and I will be responsible for any cost or loss.

**f. Payment of Indebtedness Upon Demand.** If I incur and indebtedness in an account held with one of your affiliates, such as TD Ameritrade Futures & Forex LLC, I understand and acknowledge that you and your affiliates may decide to transfer my indebtedness to my Account. Subject to Applicable Law, I will be liable for the payment upon your demand of any obligations owing in my Account, including the reasonable costs incurred in collecting such amounts.

**g. Security for Indebtedness.** I consent to you having a continuing security interest in, right of set-off to and lien on all securities, cash, investment property, and other property in my Account ("Collateral"). Subject to Applicable Rules, and without prior notice to me, you may sell or transfer the Collateral to satisfy my obligations. You also have the discretion to determine which securities and other properties are to be sold and which contracts are to be closed. You have all the rights of a secured party under the Uniform Commercial Code.

**h. Short Sales.** I will designate any sell order as a "short" sale if at the time I place the order I do not own the security I intend to sell or am unable to deliver the security before settlement. All short sales will be executed in a Margin Account.

**i. Mutual Funds and ETFs.** I authorize you to custody mutual fund holdings that I purchase directly through you. When purchasing a mutual fund, I acknowledge that I have received and read the fund prospectus. Mutual fund purchases may be subject to investment minimums, eligibility and other restrictions, as well as charges and expenses. Certain money market funds may impose liquidity fees and redemption gates in certain circumstances.

Some mutual funds sold through you impose a charge on the purchase of shares, called a "sales load." I may be able to purchase mutual fund shares through you without paying a front-end sales load, but I may be charged a fee, called a "contingent deferred sales charge," when I sell or redeem my shares. You may receive part or the entire sales load.

As discussed in the prospectus, some mutual funds agree to waive or reduce front-end sales loads for purchases over certain amounts. I am responsible for determining and obtaining any waivers, breakpoints, or providing you with sufficient information to assist me in obtaining such.

You may receive remuneration from fund companies, including, those participating in your no-load, no-transaction-fee program, for record-keeping, shareholder services, and other administrative and distribution services. The amount of your remuneration for these services is based in part on the amount of investments in such funds by your clients. Some mutual funds impose a distribution or service fee known as a "12b-1 fee." You may receive the 12b-1 fees in connection with my investment in such fund's shares. If I invest online in no-transaction-fee mutual funds ("NTF funds") directly through you, I will not pay a transaction fee. I also may be able to purchase mutual funds directly from the fund's distributor or underwriter without incurring a transaction fee. You receive remuneration from fund companies participating in the NTF fund program. NTF funds have other fees and expenses that apply to continued investment in the fund that are described in the prospectus. TD Ameritrade receives remuneration from certain ETFs (exchange-traded funds) that participate in commission-free ETF program for shareholder, administrative, and other services.

**j. Sweep Program.** My available cash may be swept into a sweep vehicle pending investment of the cash. The alternatives available under the Sweep Program are referred to as "Sweep Choices," and the one I select is referred to as the "Designated Sweep Vehicle." You will notify me of the Sweep Choices and the Designated Sweep Vehicle. I agree that at account opening my Designated Sweep Vehicle will be the TD Ameritrade FDIC Insured Deposit Account (described below), unless I select a different Sweep Choice.

Cash will be automatically invested or deposited in the Designated Sweep Vehicle, according to a sweep schedule determined by you. Proceeds from the sale of securities will be swept into the Designated Sweep Vehicle following settlement if the securities sold have been received in good deliverable form by the settlement date. The proceeds of any checks that I deposit to my Account will be swept to the Designated Sweep Vehicle on the Business Day after receipt by you and will begin earning dividends or interest on that day. Access to such funds may be withheld for up to four Business Days to assure that such checks have not been returned unpaid. I may instruct you to change my Designated Sweep Vehicle at any time to another of the Sweep Choices, and acknowledge that such instruction shall constitute my authorization to liquidate balances in my Designated Sweep Vehicle and transfer such balances to the new Designated Sweep Vehicle. I authorize you to automatically withdraw cash or redeem securities maintained in a Designated Sweep Vehicle to satisfy my obligations. I authorize you to act as my agent to purchase and redeem balances in the Designated Sweep Vehicles, and authorize you to select and use agents as you deem appropriate.

The Sweep Choices may include money market funds or an FDIC-insured deposit account ("IDA") for which you or your affiliates receive, to the extent permitted by Applicable Rules, transaction, and other fees for providing services. These fees will vary depending on the money market fund (or share class) or IDA used. No portion of these fees will reduce or offset the fees otherwise due to you unless required by Applicable Rules.

There may be certain minimum requirements for initial and subsequent investments in the Designated Sweep Vehicles. You may change the eligibility criteria or replace the Sweep Choices available to me. You will give me advance notice of any such change in Sweep Choices. Unless I notify you of an objection to such change, I authorize you to withdraw cash or redeem securities held in the prior Designated Sweep Vehicle and to invest or deposit the proceeds in the replacement Designated Sweep Vehicle.

If my Designated Sweep Vehicle is a money market fund or IDA, and my Account is flagged as a "Pattern Day Trader," on the next Business Day, you may change my Designated Sweep Vehicle to TD Ameritrade Cash (described below).

1. **TD Ameritrade FDIC Insured Deposit Account.** If the IDA is my Designated Sweep Vehicle, the available cash in my Account will be automatically deposited into an IDA at one or more banks ("Program Banks"). Two of the Program Banks are TD Bank, N.A. ("TD Bank") and TD Bank USA, N.A. ("TD Bank USA"), both affiliates of you. You will maintain a list of the current Program Banks on your website. The IDAs at the Program Banks are savings or checking accounts held in the name of Clearing as agent for its customers. You have arranged the IDAs and account records in such a way that "pass through" FDIC insurance is available to me as if I had opened the IDAs directly with a Program Bank in my own name. As a result, my funds at each Program Bank will be eligible for FDIC insurance in an amount equal to $250,000 for principal and accrued interest per depositor in each recognized legal capacity (for example, Individual, Joint, IRA). The bank sweep program has been structured to provide me with access to at least two Program Banks resulting in up to $500,000 in FDIC insurance per depositor in each recognized legal capacity (for example, up to $500,000 for individual accounts and $1,000,000 for joint accounts). Subject to deposit limits pursuant to agreements with the Program Banks, to the extent that my cash is being deposited into more than two Program Banks, it is possible for me to obtain total FDIC insurance in excess of $500,000 per depositor in each recognized legal capacity. In addition, you will determine the order of the Program Banks in the IDA for the purposes of accepting deposits based on several factors including, but not limited to, minimum and maximum deposit balances agreed to with a particular Program Bank and the contractual arrangement between you and a particular Program Bank. Such FDIC insurance will cover my money in each IDA, together with any other deposits held at each Program Bank in the same legal capacity (for example, Individual, Joint, IRA). Questions about FDIC insurance coverage may be directed to you. Information also may be obtained by contacting the FDIC, by letter (550 17th Street NW, Washington, D.C. 20429), by phone (877-275-3342, 800-925-4618 ([TTY]), by email (dcainternet@fdic.gov), or by accessing the FDIC website at fdic.gov. Learn more about FDIC coverage by using the FDIC's Electronic Deposit Insurance Estimator at 5.fdic.gov/edie/.

**My available cash will be deposited into an IDA at one or more Program Banks. You will deposit up to $247,500 in the Program Banks, per depositor per legal capacity, except for "the Excess Bank" which will receive deposits without limit, even if the amount in the IDA exceeds the FDIC insurance available to me. The list of Program Banks including "the Excess Bank" is included on your website at tdameritrade.com/idaprogrambanks. Any deposits (including certificates of deposit) that I maintain in the same insurable capacity directly with a Program Bank, or through an intermediary (such as you or another broker), will be aggregated with deposits in my IDA at such Program Bank for purposes of determining my maximum FDIC insurance amount. I am responsible for monitoring the total amount of deposits that I maintain at the Program Banks in order to determine the extent of FDIC coverage available to me.** I acknowledge that the IDAs constitute an obligation of the Program Banks and are not your obligation. I can obtain publicly available financial information concerning each Program Bank at ffiec.gov/nic or by contacting the FDIC Public Information center by mail at L. William Seidman Center, Virginia Square, 3501 North Fairfax Drive, Arlington, VA 22226 or by phone at 703-562-2200.You do not guarantee in any way the financial condition of the Program Banks or the accuracy of any publicly available financial information concerning the Program Banks. You will not be responsible for any insured or uninsured portion of the IDAs. Cash in my Account will be automatically swept on a daily basis to the IDAs at the Program Banks. As required by federal regulations, the Program Banks have the right to require seven days' prior notice before permitting a withdrawal out of a savings account. Currently, the Program Banks do not intend to exercise this right. In addition, savings accounts you hold as agent for me at a Program Bank have transfer limits that prevent using such accounts as a transaction account. The following applies to the IDAs:

- When available cash is available for deposit, you will deposit available cash from my Account into an IDA at one or more Program Banks. You will periodically rebalance my IDAs so the total amount of my funds in the IDA at Program Banks remains below applicable FDIC insurance limits (except for the Excess Bank, which has no limit).

- All withdrawals necessary to satisfy debits in my Account will be made by Clearing, as my agent. A debit will be created when I purchase securities or request a withdrawal of funds from my Account.

- My account statement will display the name of each Program Bank with which I have deposits, the balance of deposits at each Program Bank, any withdrawals made during the month, and the applicable interest rate and amount of interest earned on my deposits.

- The deposit limit at the Program Banks is set slightly below FDIC-insurance thresholds to allow for accrued interest on deposits. The deposit limit at the Program Banks is set at $247,500 ($495,000 for Joint Accounts), which may be reset from time to time based on FDIC-insurance limits and the interest rate environment. If interest paid on my funds in the IDA at one of the Program Banks results in my total funds in the IDA exceeding the deposit limit at another Program Bank, the IDAs will be rebalanced the next day and the amounts in excess of the deposit limit will be transferred to another Program Bank.

- I may not change the Program Banks, the order in which funds are deposited into the Program Banks, or the maximum deposit amount at any Program Bank. I may withdraw from the bank sweep program at any time and use another Sweep Choice.

- I will earn interest on my deposits in the IDAs in accordance with the rates or tiered rates available to me as determined by you. I understand that rates may vary based on the particular offering or the level of my assets held with you. Interest rates earned in the IDAs will vary over time, but will be paid consistent with the rate or tiered rate you make available to me regardless of which Program Bank holds my cash. The interest rates paid with respect to the IDAs may be higher or lower than the interest rates available to depositors making deposits directly with the Program Banks or other depository institutions in comparable accounts. The current interest rate will be available on the websites, or I may contact you to obtain the current rate. Interest will accrue on balances from the day they are deposited into the IDAs through the Business Day preceding the date of withdrawal from the IDA. Interest will be accrued daily and credited on the last Business Day of each month. You use the daily balance method to calculate interest on my Account.

- Clearing will act as my agent in depositing funds into the IDAs and withdrawing funds from the IDAs. No evidence of the IDAs, such as a passbook or certificate, will be issued to me. Ownership of the IDAs at the Program Banks will be evidenced by a book entry on the records of the Program Banks, and by records maintained by Clearing. I will contact you if I believe there has been any unauthorized activity between my Account and the IDAs, or if I have any complaints regarding the IDAs at the Program Banks.

- You may terminate my use of the IDA sweep feature. If you terminate my use of the IDA sweep feature, or do not wish to continue to act as my agent with respect to the IDA, I may deal directly with the Program Banks, subject to their rules, with respect to establishing and maintaining deposit accounts. In the event you terminate my use of the IDA sweep feature, you will inform me of the replacement Sweep Choice. Similarly, if I decide to terminate my use of the IDA sweep feature, or that I no longer wish to have Clearing act as my agent with respect to the IDAs, I may establish a direct depository relationship with the Program Banks, subject to the Program Banks' rules. Establishing a direct depository relationship with the Program Banks will result in the separation of my deposit balances at the Program Banks from my Account.

- The Program Banks use IDA balances to fund current and new investment and lending activity. The Program Banks seek to make a profit by achieving a positive spread between their cost of funds (for example, deposits) and the return on their assets, net of expenses. You receive a fee from the Program Banks that ranges from 0.85 to 1.20%. You have the right to waive all or part of this fee. The rate of the fee that you receive may exceed the interest rate or effective yield that I receive in my balances in the IDAs, and the payment of the fee reduces the yield that I receive. Other than the applicable fees charged on brokerage accounts, there will be no charges, fees, or commissions imposed on my Account for this Sweep Choice. The current IDA interest rate will be disclosed on your website and may be changed without prior notice.

- My deposit into IDAs at the Program Banks may need to be limited if one or more Program Banks stop accepting deposits. You will provide advance notification via the website, or other reasonable means, if any Program Bank is removed from the bank sweep program, and if advance notice is not practicable, you will notify me as soon as is reasonably practicable. If a Program Bank ceases to make its IDA available through the IDA sweep feature, I will be given an opportunity to establish a direct relationship with that Program Bank outside of the IDA sweep feature, or to transfer funds to another Program Bank participating in the IDA sweep feature, if available.

- In the event that FDIC insurance payments become necessary, the FDIC is required to pay principal plus unpaid and accrued interest to the date of the closing of the relevant Program Bank, as prescribed by applicable laws and regulations. Because there is no specific time period during which the FDIC must make available such insurable payments, I should be prepared for the possibility of an indeterminate delay in obtaining insurable payments. In addition, I may be required to provide certain documentation to the FDIC and you, such as affidavits and indemnities, before any insurance payouts are released to me. For example, if the IDA balances are held by me as trustee for the benefit of trust participants, I may be required to furnish an affidavit to that effect.

- You may change the bank sweep program terms and conditions by providing me 30 days' advance notice.

                                                                                                    AMTD 182 F 06/20

2. **TD Ameritrade Cash.** If I selected TD Ameritrade Cash as my Designated Sweep Vehicle, you will pay interest on available cash in my Account, the rate of which may be changed without prior notice. Interest will be accrued daily and credited on the last Business Day of each month. You may vary interest rates among clients in connection with special offers or combinations of services or in other circumstances. TD Ameritrade Cash represents balances pending investment and is not maintained solely for receiving credit interest. You segregate customer cash consistent with the Securities and Exchange Commission rules and regulations.

3. **Money Market Funds.** Investments in money market funds are subject to eligibility and other restrictions, as well as charges, and expenses, all as further described in the prospectus. Money market funds are securities that may increase or decrease in value. They are not insured or guaranteed by the FDIC, any other government agency, or you, and there can be no assurance that such funds will be able to maintain a stable net asset value of $1 per share. I understand that I will receive period statements for sweep transactions involving money market funds in lieu of immediate confirmations.

**k. Callable Securities.** I consent to your lottery system for allocation of partial redemption or calls. A description of your procedures for callable securities is available on your website, or hard copies are available upon request.

## 9. MARGIN TRADING

**a. Margin Account.** When I purchase securities on margin, I am borrowing money from you and pledging all securities and other property in my Account as collateral for these loans. I agree to evaluate my own financial situation, resources, investment objectives, and other relevant circumstances to determine whether margin transactions are appropriate for me. You will not make this determination. Even if I determine that margin is appropriate for me, you determine whether to make such loans to me. I also understand that trading securities on margin involves a variety of risks, including the following:

1. <u>I can lose more funds than I deposit in the margin Account.</u> A decline in the value of securities that I purchase on margin may require me to provide additional funds to you to avoid the forced sale of those securities or other securities or assets in my Account. I could lose more than the amount I deposit in my Account.

2. <u>You can force the sale of securities or other assets in my Account.</u> If the equity in my Account falls below the maintenance margin requirement, or any higher "house" requirements, you can sell the securities or other assets in any of my Accounts to cover the margin deficiency. I also will be responsible for any shortfall in the Account after such a sale.

3. <u>You can sell my securities or other assets without contacting me.</u> Some investors mistakenly believe that a firm must contact them for a margin call to be valid, and that the firm cannot liquidate securities or other assets in their accounts to meet the call unless the firm has contacted them first. This is not the case. Although you may attempt to notify me of margin calls, you are not required to do so, and even if you have contacted me and provided a specific date by which I can meet a margin call, you can still take necessary steps to protect your financial interests, including immediately selling securities without notice to me.

4. <u>I am not entitled to choose which securities or other assets in my Account are liquidated or sold to meet a margin call.</u> Because the securities are collateral for my margin loan, you have the right to decide which securities to sell in order to protect your interests.

5. <u>You can increase your "house" maintenance margin requirements at any time, and you are not required to provide me advance written notice of the change.</u> These changes to your policy often take effect immediately and may result in the issuance of a maintenance margin call. My failure to satisfy the call may cause you to liquidate or sell securities in my Account.

6. <u>I am not entitled to an extension of time on a margin call.</u> While an extension of time to meet margin requirements may be available to clients under certain conditions, I do not have a right to any extension. You will determine whether to provide an extension.

**b. Initial Margin and Margin Maintenance Requirements.** There are rules and regulations covering margin loans, including the initial and margin maintenance requirements for margin Accounts. You may impose more stringent margin requirements, which may change without notice to me.

To trade on margin, my Account must maintain at least $2,000 in minimum equity. I will meet the margin requirement in my margin Account before entering any order and will satisfy any additional requirements you may require. You may apply all premiums received from options writing against my margin requirements. I have the obligation to monitor the balances in my margin Account to ensure that I maintain sufficient amounts to meet margin requirements at all times. I agree to read carefully the TD Ameritrade Margin Handbook before purchasing securities on margin.

You may decline to extend credit to me for any reason, subject to Applicable Rules. There may be times when you have extended credit on certain securities, but due to market or other conditions, you may require additional cash or securities.

**c. Margin Interest.** I will pay interest on any credit provided to me for the purpose of purchasing, carrying, or trading in any security.

**d. Margin Interest Rates.** You utilize a base rate ("Base Rate") to set margin interest rates. My margin interest rate will vary based on the Base Rate and the margin balance ("Balance") in my margin Account during the interest period. The Base Rate may be changed without prior notice to me. You will post on the websites any changes to the Base Rate.

**e. Interest Calculation.** For each day there is a debit balance in my Account, the interest charged for that day is calculated by multiplying the applicable interest rate by my debit balance, with the result divided by 360. The sum of the daily interest charges is totaled at the end of each Account statement period and is posted to my Account on the last Business Day of the Account statement period. I will not earn interest on credit balances in my short Account.

**f. Short Sales.** Sales designated as "short" are done in my margin Account, and are subject to different margin maintenance requirements than securities purchased on margin. Short sales are subject to certain regulatory rules and cannot be executed under certain market conditions. You may not always have the securities available to facilitate my short sale. You may, without notice, "buy-in" securities to cover any short security position in my Account. I will reimburse you for any losses that you may incur. You may require me to deposit Collateral if the Collateral in my Account becomes insufficient. Short sale proceeds are part of the Collateral that secures your loan to me. I am also liable for all dividends paid, and all other distributions of cash or property, on securities that I have sold short.

**g. Pledge of Securities and Other Property.** You may pledge, repledge, hypothecate, or re-hypothecate, without notice to me, all securities and other property that you hold, carry, or maintain or for any of my margin or short Accounts. You may do so without retaining in your possession or under your control for delivery the same amount of similar securities or other property. The value of the securities and other property that you may pledge, repledge, hypothecate, or re-hypothecate may be greater than the amount I owe you, and any losses, gains, or compensation that result from these activities will not accrue to my Account.

AMTD 182 F 06/20

**h. Loan of Securities.** You are authorized to lend to yourself or others any securities you hold in my Account and to carry all securities lent as general loans. In connection with such loans, you may receive compensation and retain certain benefits that I will not be entitled to, such as interest on Collateral posted for such loans. In certain circumstances, such loans may limit my ability to exercise voting rights with respect to the securities lent. I may request that fully paid securities not be used in connection with short sales. I understand that in certain situations in which you have borrowed my securities, I may receive a "payment in lieu" of the dividend issued (see Margin Handbook for more details).

## 10. OPTIONS TRADING

If I elect to engage in options transactions, I will be bound by the following additional terms:

**a. Suitability.** Options are not suitable for all investors. Options trading has inherent risks and I am prepared financially to undertake such risks and to withstand the losses that may be incurred. I acknowledge I have received or have been given access to the "Characteristics and Risks of Standardized Options" by the Options Clearing Corporation (OCC).

**b. General Terms.**

- I am responsible for knowing the rights and terms of all options in my Account. I agree to be bound by the FINRA, OCC, and exchange rules applicable to the trading of options contracts.
- If my options trading occurs in a margin Account, it is subject to the terms and conditions applicable to margin trading.
- Settlement on options cleared through the OCC is the Business Day after the trade date. I shall not exceed the position and exercise limits imposed by the rules of the OCC.
- I am responsible for instructing you as to my intention to exercise options contracts before the expiration date. Absent proper and timely exercise instructions from me, you have no obligation to exercise any right, privilege or obligation of any option for my Account. I agree that my failure to provide you with proper and timely instructions may result in the option expiring worthless, even though it may have a monetary value on the expiration date. I agree to read carefully the Margin Handbook for additional terms and important information regarding options exercise.
- You collect information only to establish option trading permission and not for the purpose of monitoring Account holdings or option positions.
- You and Clearing are authorized to take steps to protect their position and any obligation they have assumed at my request without notifying me.
- If I write (short) a call options contract that requires the delivery of securities to be sold, I may be required to keep the securities in my Account until the expiration of the options period and may not be allowed to sell or withdraw the securities.
- If I write (short) a put options contract that requires payment for securities to be purchased, I may be required to keep sufficient funds in my Account to make the payment until the expiration of the options period, and may not be allowed to withdraw the funds or use them for any other purpose. If I am assigned on the options, Clearing may use the funds for the purchase of the securities without prior notice to me.
- All short equity and some index options positions are available for assignment. Exercise assignment notices for equity or index options are randomly allocated among all clients' short positions.

## 11. INITIAL PUBLIC AND FOLLOW-UP OFFERINGS

You may participate as underwriter or a member of the selling group of, and provide access to, Initial Public Offerings (IPOs) and follow-up offerings. If I participate in such, I will be bound by additional terms.

## 12. ARBITRATION

**This Agreement contains a predispute arbitration clause. By signing an arbitration clause, the parties agree as follows:**

- **All parties to this Agreement are giving up their right to sue each other in court, including the right to jury trial, except as provided by the rules of the arbitration forum in which a claim is filed.**
- **Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.**
- **The ability of the parties to obtain documents, witness statements, and other discovery is generally more limited in arbitration than in court proceedings.**
- **The arbitrators do not have to explain the reason(s) for their award unless, in an eligible case, a joint request for an explained decision has been submitted by all parties to the panel at least 20 days prior to the first scheduled hearing date.**
- **The panel of arbitrators may include a minority of arbitrators who were or are affiliated with the securities industry.**
- **The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.**
- **The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this Agreement.**
- **No person will bring a putative or certified class action to arbitration, nor seek to enforce any predispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (1) the class certification is denied; (2) the class is decertified; or (3) the client is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate will not constitute a waiver of any rights under this Agreement except to the extent stated herein.**

**I agree that any controversy between you and your affiliates, any of their respective officers, directors, employees, or agents and me (including any of my officers, directors, employees, or agents) arising out of or relating to this Agreement, our relationship, any Services provided by you, or the use of the Services, and whether arising before or after the date of this Agreement, shall be arbitrated and conducted under the provisions of the Code of Arbitration of the FINRA. Unless otherwise agreed, the parties shall resolve the controversy through arbitration rather than court. If any party unsuccessfully resists confirmation or enforcement of an arbitration award rendered under this Agreement, then that party shall pay all costs, attorneys' fees, and expenses incurred by the other party or parties in confirming or enforcing the award. Arbitration must be initiated by service upon the other party of a written demand for arbitration or notice of intention to arbitrate. Judgment, upon any award rendered by the arbitrator, may be entered in any court having jurisdiction.**

## 13. ADVICE

a.  Unless otherwise noted by you in writing, you will act only as broker-dealer and not as an investment advisor governed by the Investment Advisers Act of 1940.

b.  When I act as a self-directed investor, I am responsible for determining the suitability of any particular investment strategy, transaction, or security. You have no responsibility for any such determination unless you otherwise agree in writing, or you or your representative gives advice directly to me that is identified clearly as a recommendation by you to enter into a particular transaction or to buy, sell, or hold a particular security or securities.

c.  From time to time, in connection with my Account, you may provide investment-related guidance or recommendations to me. In the event that a recommendation is made, you and/or your representative shall have my informed consent to deliver the Form CRS Customer Relationship Summary for TD Ameritrade or its affiliates, as required ("Form CRS") - as well as any other notices, disclosures, or communications - to any mailing address, email address or facsimile number that I provide in connection with either the Account, or any other accounts that I open or otherwise maintain with you. I understand that I can also access the Form CRS by visiting tdameritrade.com/regbi. I understand and acknowledge that it is incumbent on me to provide you with current and accurate contact information for the delivery of these documents. I acknowledge that I shall read and understand the Form CRS - as well as any other notices, disclosures, or communications - prior to acting upon any such recommendation. I agree that when you make a recommendation to me, you determine whether it is suitable and in my best interest at the time of the recommendation. If the recommended transaction is not effected contemporaneously with your recommendation, I agree you will have no liability if I choose to effect such transaction in the future. Furthermore, when you are acting as broker-dealer for my Account, I agree that you have no ongoing duty to ensure a recommendation continues to be suitable for me. Rather, I have an affirmative duty to monitor profits and losses in my Account, along with my investment goals and risk tolerance and to modify my trading decisions accordingly.

d.  Unless otherwise agreed to in writing, you do not have discretionary authority over my Account or an obligation to monitor, review or make recommendations for the investment of securities or cash in my Account.

e.  Any research, analysis, news, or other information made available by you does not constitute an individualized recommendation by you to buy, sell, or hold a particular security.

f.  You do not provide legal, tax, or estate planning advice.

## 14. MISCELLANEOUS

a. Severability. If any provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future laws, such provisions shall be fully severable. In such event: (1) this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision has never comprised a part of this Agreement or was modified to be legal, valid, and enforceable; and (2) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provisions or by its severance from this Agreement, to the extent permitted by Applicable Rules.

b. Account Handbook. The Account Handbook provided to me upon account opening, and available on your websites, contains important information about my Account. I will refer to the Account Handbook to learn additional information about the handling of trade orders, the receipt and delivery of funds, account policies, and other general account information.

c. Entirety of Agreement. This Agreement, any attachments hereto, the addenda and other agreements referred to in this Agreement and the terms and conditions contained in the Account statements and confirmations contain the entire agreement between you and me; and it supersedes all prior or contemporaneous communications and proposals, whether electronic, oral, or written, between me and you, provided, however, any and all other agreements if any, between me and you and your affiliates, not inconsistent with this Agreement will remain in full force and effect, and if there are any conflicts between this Agreement and any attachments or other agreements, this Agreement shall prevail.

d. Assignment and Escheatment. I may not assign this Agreement or any rights or obligations under this Agreement without first obtaining your prior written consent. You may assign, sell, or transfer my Account and this Agreement, or any portion thereof, at any time, without my prior consent. The assets in my Account may be transferred to the appropriate state if no activity occurs in my Account within the time period specified by state law.

e. Amendment. You reserve the right to amend this Agreement without prior notice to me or as required by Applicable Rules. The current version of the Agreement will be posted on the websites and my continued Account activity after such amendment constitutes my agreement to be bound by all amendments to the Agreement, regardless of whether I have actually reviewed them. You are not bound by any verbal statements that seek to amend the Agreement.

f. Termination. I may terminate this Agreement, or close, deactivate, or block access to my Account. If you decide to close my Account and I fail to transfer it to another broker, you may liquidate my Account and send me the proceeds. I will remain responsible for the payment of all obligations incurred in my Account or otherwise. I may terminate this Agreement after paying any obligations owed upon written notice. The Agreement survives termination of the Account.

g. Force Majeure. You will not be liable for loss caused directly or indirectly by conditions beyond your reasonable control, including but not limited to Force Majeure events. "Force Majeure" means events that are beyond the reasonable control of a party, including but not limited to the following: disasters, extraordinary weather conditions, earthquakes or other acts of God, war, insurrection, riot, labor strikes, terrorist acts, government restrictions, exchange or market rulings, suspension of trading, computer or communication line failure, or failure of market centers or transmission facilities.

h. Indemnification. I agree to indemnify and hold harmless you, your affiliates, and Third-Party Providers and your and their respective officers, directors, employees, agents, and representatives from any and all liabilities, losses, costs, judgments, penalties, claims, actions, damages, expenses, or attorney's fees (collectively "Losses") resulting or arising directly or indirectly from use of the Services or transactions in my Account, except to the extent that such Losses are the direct result of your gross negligence or willful misconduct.

i. Waiver. Your failure to insist on compliance with this Agreement will not constitute a waiver of any of its rights.

j. Admissibility of Documents in Proceedings. All documents in any format are considered to be true, complete, valid, authentic, and enforceable records of the applicable document, admissible in judicial or administrative proceedings to the same extent as if the documents and records were originally generated and maintained in printed form. I will not contest the admissibility or enforceability of your copy of the documents in any proceeding arising out of this Agreement.

k. Governing Law, Jurisdiction, and Venue. This Agreement will be governed by the laws of the State of Nebraska, but not its conflicts of law provisions. I hereby consent to the jurisdiction of and venue within the State of Nebraska for all disputes arising out of or relating to this Agreement.

AMTD 182 F 06/20

**l. NJ State Law.** New Jersey law prohibits contractual provisions that violate the legal rights of a NJ consumer or responsibility of a seller. No provision in this Agreement shall apply to any NJ consumer if it violates any such right or responsibility, including grounds for redress based on: (i) your tortious actions; (ii) the NJ Punitive Damages Act; (iii) the NJ Uniform Commercial Code; or (iv) your failure to protect reasonably against criminal acts of third parties.

**m. Worthless Securities.** You may remove a worthless security from my account including, and without limitation to, the following circumstance: your primary custodian, the Depository Trust Company, has deemed the security eligible for removal and you have reviewed and determined, to the best of your ability, that the security has no market value. I agree to waive any claim to any future distribution from the security and agree to indemnify and hold you harmless from any claims, liability, or damages resulting from the removal of such security. If I provide you with evidence of the value of the security from an independent third party within 60 days of receiving your account statement noting the removal, you will review and, if able to, reinstate my position.

Investment Products: Not FDIC Insured  *  No Bank Guarantee  *  May Lose Value

TD Ameritrade, Inc. and TD Ameritrade Clearing, Inc., members FINRA/SIPC. TD Ameritrade, Inc., TD Bank, N.A., and TD Bank, USA are affiliated through their parent companies. TD Ameritrade is a trademark jointly owned by TD Ameritrade IP Company, Inc. and The Toronto-Dominion Bank. © 2020 TD Ameritrade.

AMTD 182 F 06/20

**EXHIBIT C**



**EXHIBIT D**



# TD Ameritrade Futures & Forex LLC
# FCM-Specific Disclosure Document

600 W. Chicago Ave. Suite 100 ■ Chicago, IL 60654-2597

Phone: 866-839-1100 ■ Fax: 773-435-3232

## TABLE OF CONTENTS

Introduction ........................................................................................................ 2
Firm and Its Principals ......................................................................................... 2
Firm's Business ................................................................................................... 4
FCM Customer Business ...................................................................................... 4
Permitted Depositories and Counterparties ............................................................ 4
Material Risks ..................................................................................................... 5
Material Complaints or Actions ............................................................................. 5
Customer Fund Segregation .................................................................................. 5
Filing a Complaint ............................................................................................... 7
Relevant Financial Data ....................................................................................... 7
Risk Management Summary .................................................................................. 8
Leverage Ratio .................................................................................................... 8

TDA 614 F 01/20



# TD Ameritrade Futures & Forex LLC
# FCM-Specific Disclosure Document

600 W. Chicago Ave. Suite 100 ■ Chicago, IL 60654-2597

Phone: 866-839-1100 ■ Fax: 773-435-3232

## INTRODUCTION

The Commodity Futures Trading Commission ("Commission") requires each futures commission merchant ("FCM"), including TD Ameritrade Futures & Forex LLC ("TD Ameritrade Futures & Forex"), to provide the following information to a customer prior to the time the customer first enters into an account agreement with the FCM or deposits money or securities (funds) with the FCM. Except as otherwise noted below, the information set out is as of January 1, 2020. TD Ameritrade Futures & Forex will update this information annually and as necessary to take account of any material change to its business operations, financial condition or other factors that TD Ameritrade Futures & Forex believes may be material to a customer's decision to do business with TD Ameritrade Futures & Forex. Nonetheless, TD Ameritrade Futures & Forex's business activities and financial data are not static and will change in non-material ways frequently throughout any 12-month period.

[NOTE: TD Ameritrade Futures & Forex LLC is a subsidiary of TD Ameritrade Holding Corporation. Information that may be material with respect to TD Ameritrade Futures & Forex LLC for purposes of the Commission's disclosure requirements may not be material to TD Ameritrade Holding Corporation for purposes of applicable securities laws.]

## FIRM AND ITS PRINCIPALS

TD Ameritrade Futures & Forex LLC
600 West Chicago Ave.
Suite 100
Chicago, IL 60654
866-839-1100 phone
773-435-3232 fax
futuressupport@tdameritrade.com

TD Ameritrade Futures & Forex's Designated Self-Regulatory Organization (DSRO) is the National Futures Association (NFA) www.nfa.futures.org.

The following is a list of TD Ameritrade Futures & Forex's Principals along with their title, business address, business background, areas of responsibility, and the nature of the duties of each principal as defined in § 3.1(a):

**James Mackenzie, President, TD Ameritrade Futures & Forex**
**Business Address:** 600 W. Chicago Ave, Suite 100, Chicago, IL 60654

**Background:** James Mackenzie has worked in the financial industry for more than 16 years. Prior to coming to TD Ameritrade, he worked at MF Global, Penson Futures, and Goldenberg Hehmeyer where his main focus was with technology and trading. James holds a Series 3 and 34, has a Bachelor of Arts in Biology and Psychology from Middlebury College, and an MBA from the University of Notre Dame.

**Areas of Responsibility:** Futures & Forex Operations
**Duties:** James Mackenzie is responsible for the Futures and Forex business at TD Ameritrade Futures & Forex.

**William Yates, Chief Financial Officer and Treasurer, TD Ameritrade Futures & Forex**
**Business Address:** 200 South 108th Avenue, Omaha, NE 68154

**Background:** William Yates is responsible for the development and implementation of treasury strategies, managing treasury operations, liquidity, and cash management. William has been with TD Ameritrade since 1996, serving in a number of roles within the company's finance, operations, and compliance functions during his tenure. Prior to joining TD Ameritrade, William spent nine years with the public accounting firm Arthur Andersen LLP. William has served in various capacities in the securities industry, including most recently as a member of the Midwest District Committee of the Financial Industry Regulatory Authority (FINRA). He also serves on the boards and various board committees of the Options Clearing Corporation and CHI Health. He holds Series 7, 24, 27, and 53 licenses, and is a member of the Nebraska State Society of Certified Public Accountants and the American Institute of Certified Public Accountants.

**Areas of Responsibility:** Treasury
**Duties:** William Yates oversees treasury functions for TD Ameritrade Futures & Forex.

**Gregg Fuesel, Director, Regulatory Reporting**
**Business Address:** 200 South 108th Avenue, Omaha, NE 68154

**Background:** Gregg Fuesel is Director of Regulatory Reporting at TD Ameritrade. He started at TD Ameritrade in March of 2011. He has worked at multiple broker-dealers along with ten years at the Options Clearing Corporation. Regulatory Reporting is responsible for filing multiple regulatory reports and adhering to regulations of the SEC, FINRA, CFTC, and the NFA along with coordinating the monthly Regulatory Reporting Committee which is responsible for overseeing the regulatory reporting requirements of certain subsidiaries of the Company. He is also a member of the SIFMA Capital Committee. He holds Series 3, 4, 7, 27, 34, and 63 licenses.

**Areas of Responsibility:** Regulatory Reporting
**Duties:** Gregg Fuesel oversees the 1-FR-FCM Report, Segregation Computation, and Regulatory Reporting for TD Ameritrade Futures & Forex.

TDA 614 F 01/20

**Joe Iraci, Managing Director, Financial Risk Management**
**Business Address:** 1 Plaza Four A, Jersey City, NJ 07311

**Background:** Joe Iraci is a Managing Director at TD Ameritrade where he heads the Financial Risk Management team. Prior to this position, he headed the Financial Markets Services Group, and the Corporate Risk team. Prior to joining TD Ameritrade, Joe held several senior risk management positions within Fidelity Investments at both Fidelity Employer Services Corporation and Fidelity Brokerage Company. Joe previously had been the Head of New Business Operations, UBS AG, and the Regional Head Americas/Deputy Global Head of Operational Risk at Deutsche Bank AG, a position he assumed from heading the Business Risk Management for Deutsche Bank's Corporate Trust and Agency Services business. Prior to joining Deutsche Bank, Joe had been a Bank Examiner with the FDIC and served in the United States Marine Corps. Joe completed his undergraduate studies at St. John's University and received his MBA from New York University.

**Areas of Responsibility:** Risk Management
**Duties:** Joe Iraci oversees risk management functions for TD Ameritrade Futures & Forex.

**Spyro Karetsos, Chief Risk Officer**
**Business Address:** 1 Plaza Four A, Jersey City, NJ 07311

**Background:** In partnership with business units across TD Ameritrade, Spyro Karetsos helps identify and manage the organization's credit, market and operational risks. He is also a member of the Company's senior operating committee (SOC), which helps shape the strategic focus of the organization.

Karetsos joined TD Ameritrade in 2019, bringing more than 20 years of financial services experience to the Company. He most recently served as head of non-financial risk and Enterprise Risk Services for SunTrust Bank with responsibility for Strategic Risk, Operational Risk, and Third-Party Risk. His work as architect of SunTrust's advanced risk appetite framework earned it **Risk.net's** 2018 Bank of the Year award.

Prior to SunTrust, Karetsos held leadership positions with Vanguard, Goldman Sachs, and spent 10 years in the Federal Reserve System where he worked at the Federal Reserve Bank of New York and became an assistant vice president of the Federal Reserve Bank of Philadelphia.

A Risk Management Association board member since 2013, Karetsos earned a Bachelor of Arts in policy studies from Dickinson College and a Master of Business Administration from Pace University. He also holds a certificate from the Graduate School of Banking at the University of Wisconsin.

**Areas of Responsibility:** Risk Management
**Duties:** Spyro Karetsos oversees all risk management functions for TD Ameritrade Futures & Forex.

**Ben Miller, Director, TD Ameritrade Futures & Forex**
**Business Address:** 3000 TD Ameritrade Lane, Southlake, TX 76092

**Background:** Ben Miller has more than 18 years of financial industry experience. Prior to coming to TD Ameritrade, he worked for Penson Futures for more than 10 years and he has experience with Coquest (a registered IB) and ED&F Man where his main focus was with operations. Ben holds a Series 3, 30, and 34 and has a Bachelor of Business Administration from the University of Oklahoma.

**Areas of Responsibility:** Futures & Forex Operations
**Duties:** Ben Miller oversees futures and forex operations for TD Ameritrade Futures & Forex.

**Steven Quirk, Chief Executive Officer, TD Ameritrade Futures & Forex**
**Business Address:** 600 West Chicago Avenue, Suite 100, Chicago, IL 60654

**Background:** Steven Quirk oversees the strategy and deployment of initiatives for the Active Trader segment at TD Ameritrade. He also serves as a member of the Company's senior operating committee (SOC), which shapes the strategic focus of the organization. Prior to his current role, Steven was responsible for the development of new trading tools and technology enhancements for the thinkorswim by TD Ameritrade trading platform. Steven's 28-year trading career began in 1987 as a Chicago Board Options Exchange (CBOE) market maker. While at the CBOE, he served on the exchange's Index Market Performance Committee and the Arbitration Committee. Steven was a partner with SCMS for seven years, trading options on index products. He also led the Chicago operations of Van der Moolen USA. Steven graduated from the University of Wisconsin with a B.B.A. in Risk/Insurance and Marketing. He holds Series 3, 4, 7, 24, 34, and 63 licenses.

**Areas of Responsibility:** Registered Principal; Trading
**Duties:** Steven Quirk oversees the strategy and deployment of initiatives for the Active Trader segment at TD Ameritrade.

**Susan Boudrot, Managing Director, Global Chief Compliance Officer, TD Ameritrade Holding Corporation**
**Business Address:** 1 Plaza Four A, Jersey City, NJ 07311

**Background:** Susan Boudrot has worked in the financial industry for over 28 years. She currently is a Managing Director and the Global Chief Compliance Officer. She oversees Compliance for the TD Ameritrade Holding Corporation. She is also on the board of directors for TD Ameritrade Futures & Forex. She previously worked at Fidelity where she was responsible for the compliance teams which supported the retail brokerage firm, the defined contribution/benefit organization, the trust company, the insurance agency, the custodial platform for third party investment advisors, and the privacy program. Prior to that, she worked at Charles Schwab where her team supported brokerage operations, advertising, retail sales, research, and the international affiliates of the firm. She was the CCO and General Counsel at Brown & Company, a discount broker-dealer. She also was an Enforcement Attorney with the SEC and an associate in private corporate practice. She has a JD and an MBA from Boston University and a BA from Regis College. She holds the Series 3, 4, 7, 8, 14, 24, and 63 licenses.

**Areas of Responsibility:** Compliance
**Duties:** Susan Boudrot oversees the compliance functions of TD Ameritrade.

**Scott Seiffert, Chief Financial Officer, TD Ameritrade Futures & Forex**
**Business Address:** 200 South 108th Avenue, Omaha, NE 68154

**Background:** Scott Seiffert has more than 20 years of financial services industry experience and is Chief Financial Officer at TD Ameritrade. He has been with TD Ameritrade since July 2016 and prior to joining, held several senior finance positions with Wells Fargo Advisors. Scott previously worked in internal audit at Edward Jones and spent almost 12 years in public accounting. Scott earned a bachelor's degree in Business Administration from the University of Missouri–St. Louis. He holds a Series 27 license.

**Areas of Responsibility:** Accounting and Finance
**Duties:** Scott Seiffert oversees the accounting and financial functions for TD Ameritrade Futures & Forex.

**John Burns, Chief Compliance Officer, TD Ameritrade Futures & Forex**
**Business Address:** 600 W. Chicago Ave, Suite 100, Chicago, IL 60654

**Background:** John Burns joined TD Ameritrade in 2018 with 14+ years of futures industry experience. He was previously the Chief Compliance Officer and a Principal of Huatai Financial USA, Inc., the Chicago, IL based FCM affiliate of Chinese brokerage firm Huatai Securities Co. Ltd. He began his career as a clerk in the agriculture pits on the floor of the Chicago Board of Trade. In 2007 Mr. Burns transitioned into the compliance department of R.J. O'Brien & Associates, LLC, the oldest and largest independent futures brokerage and clearing firm in the United States, where some of his responsibilities included oversight of the IB network, account on-boarding, trade surveillance, CTA/CPO due diligence, and position reporting. Mr. Burns has a B.S. in Political Science from Northern Illinois University, M.S. in Finance from Lewis University, Six Sigma Green Belt, and a Series 3 license.

**Areas of Responsibility:** Compliance
**Duties:** John Burns oversees the compliance functions for TD Ameritrade Futures & Forex.

## FIRM'S BUSINESS

TD Ameritrade Futures & Forex's business activity caters to self-directed retail futures and forex customers. Our customer base is more than 90% individual or joint accounts. TD Ameritrade Futures & Forex clients do not have direct market or API access to the futures markets. TD Ameritrade Futures & Forex currently offers the ability to execute orders on the CME Group (CME, CBOT, NYMEX & COMEX) ICE US, and CFE. Current product groups offered to our customers to trade include: interest rates; metals; currency; grains; stock index; energy, softs; forest; and livestock futures contracts. TD Ameritrade Futures & Forex offers approximately 75 different non-commission forex pairs. This business activity is supported by one hundred percent (100% ) of the firm's assets and capital.

## FCM CUSTOMER BUSINESS

On November 25th, 2019, The Charles Schwab Corporation and The TD Ameritrade Holding Corporation announced that they have entered into a definitive agreement for Schwab to acquire TD Ameritrade in a stock transaction valued at approximately $26 billion. The proposed acquisition has not materially impacted TD Ameritrade Futures & Forex LLC or its clients. For additional details please visit https://www.amtd.com/news-and-stories/press-releases/press-release-details/2019/acquisition-information-center/default.aspx. TD Ameritrade Futures & Forex is owned by TD Ameritrade Online Holding Corporation, which is a wholly owned subsidiary of TD Ameritrade Holding Corporation (along with its subsidiaries "AMTD"), a publicly held company with a market capitalization of over $27 billion and liquid assets in excess of $200 million. AMTD, through its broker-dealer and FCM subsidiary, serves an investor base comprised of over 11.0 million funded customer accounts with over $1.1 trillion in customer assets.

TD Ameritrade Futures & Forex caters to self-directed retail futures and forex customers. Our customer base is more than 90% individual or joint accounts. TD Ameritrade Futures & Forex clients do not have direct market or API access to the futures markets. TD Ameritrade Futures & Forex currently offers the ability to execute orders on the CME Group (CME, CBOT, NYMEX, & COMEX), ICE US, and CFE. Current product groups offered to our customers to trade include: interest rates, metals, currency, grains, stock index, energy, softs, forest, and livestock futures contracts. TD Ameritrade Futures & Forex offers approximately 75 different non-commission forex pairs.

TD Ameritrade Futures & Forex does not own any futures exchange clearing memberships or self-clear any futures or futures options products. TD Ameritrade Futures & Forex utilizes two clearing firms, ADM Investor Services, Inc., and ABN AMRO Clearing Chicago LLC, to clear its futures business. TD Ameritrade Futures & Forex is not involved directly or indirectly in taking proprietary trading positions in listed derivatives or engaging in arbitrage activities of any kind. In addition, TD Ameritrade Futures & Forex is not involved in clearing swaps or engaged in over-the-counter derivatives trading. TD Ameritrade Holding's international business is currently limited to its offering of TD Ameritrade Singapore Pte. Ltd. and TD Ameritrade Hong Kong Ltd.

## PERMITTED DEPOSITORIES AND COUNTERPARTIES

TD Ameritrade Futures & Forex will invest futures customer funds in cash and/or U.S. Government securities. The customer segregated funds will remain in cash and/or U.S. Government securities held at US Bank, ABN AMRO, and ADM Investor Services, Inc. The omnibus accounts titled "TD Ameritrade Futures & Forex LLC Regulation 1.20 Customer Segregated Account" will be a combination of cash and U.S. Government securities pursuant to § 1.25.

TD Ameritrade Futures & Forex maintains and adheres to a separate Depository Selection Policy. TD Ameritrade Futures & Forex performs regular reviews of their bank depositories, counterparties, and vendors to insure that they can support the futures and forex business. The reviews include, but are not limited to:

• A yearly review of the operational capabilities, ideally via a SOC1 or external audit.

• A quarterly financial review by the Treasury department which includes, but is not limited to, a review of the credit ratings from Moody's and S&P.

• A quarterly operational review focused on any issues or concerns raised during the prior quarter.

• A quarterly review of any regulatory actions or fines as well as any major changes in personnel supporting TD Ameritrade Futures & Forex's business with the depository, counterparty, or vendor.

The results of each of these reviews are shared during the quarterly TD Ameritrade Futures & Forex Risk Committee meeting. An appropriate action plan, if needed, will be put in place. It is important to note that additional reviews may take place outside of the listed formal reviews. Depending on the depth of the review, it may or may not be reported to the Risk Committee.

## MATERIAL RISKS

While TD Ameritrade Futures & Forex does not believe any of the following risks to be material, TD Ameritrade Futures & Forex recognizes that customers may be subject to liquidity, credit, and/or counterparty risks by entrusting funds with TD Ameritrade Futures & Forex. TD Ameritrade Futures & Forex attempts to limit these risks by maintaining excess capital and investments in cash or highly liquid, readily accessible products.

In order to assure that it is in compliance with its regulatory capital requirements and that it has sufficient liquidity to meet its ongoing business obligations, TD Ameritrade Futures & Forex holds a significant portion of its nonsegregated liquid assets in cash, highly liquid money market mutual funds, and/or U.S. Treasury securities guaranteed as to principal and interest. As of the date of this disclosure, all nonsegregated liquid funds are held in either 1) cash in a bank account or 2) highly liquid money market mutual funds, both of which are in the name of TD Ameritrade Futures & Forex. Therefore, all nonsegregated liquid assets are available on demand.

TD Ameritrade Futures & Forex carries no debt on the balance sheet and is therefore not financially leveraged. TD Ameritrade Futures & Forex currently has approximately US$131 million of net capital as of July 1, 2019. TD Ameritrade Futures & Forex holds 100% of investments in overnight cash or cash equivalents, and therefore has adequate available liquidity at all times. Principal liabilities are payables to clients, accounts payable, and deferred income taxes.

TD Ameritrade Futures & Forex holds customer funds in cash and U.S. Treasury securities within properly established §1.20 accounts in the name of TD Ameritrade Futures & Forex LLC and in compliance with §1.25. Customer funds are not invested in any affiliated entity. The weighted average maturity of customer funds invested in U.S. Treasuries is .01 years and the weighted average yield is 0.97 percent.

TD Ameritrade Futures & Forex parent corporation, TD Ameritrade Holding Corp., is rated A and A2 by S&P and Moody's, respectively.

TD Ameritrade Futures & Forex has no material commitments.

## MATERIAL COMPLAINTS OR ACTIONS

On April 10, 2018, Diego Krukever, Karem Sandgarten and Amir Rahimi, filed a putative class action lawsuit against TD Ameritrade Futures & Forex and TD Ameritrade, Inc. (collectively, TD Ameritrade) in the United States District Court for the Southern District of Florida. Plaintiffs, clients of TD Ameritrade, allege that TD Ameritrade Futures & Forex, wrongfully liquidated plaintiffs' short put options on E-Mini S&P 500 futures contracts between the stock market closing on February 5, 2018, and the stock market opening on February 6, 2018, during which time they allege the options futures markets were illiquid. Plaintiffs claimed that the conduct of TD Ameritrade Futures & Forex operated as a fraud or deceit in violation of section 6b(e)(3) of the Commodity Exchange Act and section 180.1(a)(3) of the CFTC regulations, and breached an implied covenant of good faith and fair dealing by failing to liquidate positions in a commercially reasonable way. Plaintiffs claimed that TD Ameritrade, Inc. aided and abetted the alleged violations by TD Ameritrade Futures & Forex. Plaintiffs alleged that defendants caused plaintiffs and class members to incur tens of millions of dollars of losses. On July 23, 2018, TD Ameritrade filed a motion to dismiss plaintiffs' second amended complaint, which plaintiffs have opposed. On October 5, 2018, the Court dismissed with prejudice the claims that the conduct of TD Ameritrade Futures & Forex operated as a fraud or deceit in violation of the above-referenced sections of the Commodity Exchange Act and the CFTC regulations and the aiding and abetting claim against TD Ameritrade, Inc. The Court denied the motion to dismiss the claim of breach of an implied covenant of good faith and fair dealing. On December 17, 2018, the Court denied Plaintiffs' motion for class certification. Discovery has begun. Another lawsuit containing substantial similar allegations against TD Ameritrade Futures & Forex has been filed in the United States District Court for the Eastern District of California, and other clients have filed similar claims in arbitrations. TD Ameritrade intends to vigorously defend against the lawsuits and the arbitrations and is unable to predict the outcome or the timing of the ultimate resolution of this litigation, or the potential losses, if any, that may result.

*Other Legal and Regulatory Matters* – TD Ameritrade Futures & Forex may be subject to a number of other lawsuits, arbitrations, claims, and other legal proceedings in connection with its business. Some of these legal actions include claims for substantial or unspecified compensatory and/or punitive damages. In addition, in the normal course of business, TD Ameritrade Futures & Forex discusses matters with its regulators raised during regulatory examinations or otherwise subject to their inquiry. These matters could result in censures, fines, penalties, or other sanctions. In light of the uncertainties involved in such matters, TD Ameritrade Futures & Forex is unable to predict the outcome or the timing of the ultimate resolution of these matters, or the potential losses, fines, penalties, or equitable relief, if any, that may result, and it is possible that the ultimate resolution of one or more of these matters may be material to TD Ameritrade Futures & Forex's results of operations for a particular reporting period.

## CUSTOMER FUNDS SEGREGATION

**Customer Accounts.** FCMs may maintain up to three different types of accounts for customers, depending on the products a customer trades:

(i)   a *Customer Segregated Account* for customers that trade futures and options on futures listed on U.S. futures exchanges;

(ii)  a *30.7 Account* for customers that trade futures and options on futures listed on foreign boards of trade (At this time, TD Ameritrade Futures & Forex customers do not engage in activity that requires a 30.7 account.); and

(iii) a *Cleared Swaps Customer Account* for customers trading swaps that are cleared on a DCO registered with the Commission (At this time, TD Ameritrade Futures & Forex customers do not engage in activity that requires a cleared swaps customer account.).

The requirement to maintain these separate accounts reflects the different risks posed by the different products. Cash, securities, and other collateral (collectively, Customer Funds) required to be held in one type of account, for example, the Customer Segregated Account, may not be commingled with funds required to be held in another type of account, for example, the 30.7 Account, except as the Commission may permit by order. For example, the Commission has issued orders authorizing ICE Clear Europe Limited, which is registered with the Commission as a DCO, and its FCM clearing members: (i) to hold in Cleared Swaps Customer Accounts Customer Funds used to margin both (a) Cleared Swaps and (b) foreign futures and foreign options traded on ICE Futures Europe, and to provide for portfolio margining of such Cleared Swaps and foreign futures and foreign options; and (ii) to hold in Customer Segregated Accounts Customer Funds used to margin both (c) futures and options on futures traded on ICE Futures U.S. and (d) foreign futures and foreign options traded on ICE Futures Europe, and to provide for portfolio margining of such transactions.

**Customer Segregated Account.** Funds that customers deposit with an FCM, or that are otherwise required to be held for the benefit of customers, to margin futures and options on futures contracts traded on futures exchanges located in the U.S., for example, designated contract markets, are held in a **Customer Segregated Account** in accordance with section 4d(a)(2) of the Commodity Exchange Act and Commission Rule 1.20. **Customer Segregated Funds** held in the Customer Segregated Account may not be used to meet the obligations of the FCM or any other person, including another customer.

All Customer Segregated Funds may be commingled in a single account, such as a customer omnibus account, and held with: (i) a bank or trust company located in the U.S.; (ii) a bank or trust company located outside of the U.S. that has in excess of US$1 billion of regulatory capital; (iii) an FCM; or (iv) a DCO.

Such commingled account must be properly titled to make clear that the funds belong to, and are being held for the benefit of, the FCM's customers. Unless a customer provides instructions to the contrary, an FCM may hold Customer Segregated Funds only: (i) in the U.S.; (ii) in a money center country; or (iii) in the country of origin of the currency.

An FCM must hold sufficient U.S. dollars in the U.S. to meet all U.S. dollar obligations and sufficient funds in each other currency to meet obligations in such currency. Notwithstanding the foregoing, assets denominated in a currency may be held to meet obligations denominated in another currency (other than the U.S. dollar) as follows: (i) U.S. dollars may be held in the U.S. or in money center countries[1] to meet obligations denominated in any other currency; and (ii) funds in money center currencies[2] may be held in the U.S. or in money center countries to meet obligations denominated in currencies other than the U.S. dollar.

**30.7 Account.** Funds that **30.7 Customers** deposit with an FCM, or that are otherwise required to be held for the benefit of customers, to margin futures and options on futures contracts traded on foreign boards of trade, for example, **30.7 Customer Funds**, and sometimes referred to as the **foreign futures and foreign options secured amount**, are held in a **30.7 Account** in accordance with Commission Rule 30.7.

Funds required to be held in the 30.7 Account for or on behalf of 30.7 Customers may be commingled in an omnibus account and held with: (i) a bank or trust company located in the U.S.; (ii) a bank or trust company located outside the U.S. that has in excess of US$1 billion in regulatory capital; (iii) an FCM; (iv) a DCO; (v) the clearing organization of any foreign board of trade; (vi) a foreign broker; or (vii) such clearing organization's or foreign broker's designated depositories. Such commingled account must be properly titled to make clear that the funds belong to, and are being held for the benefit of, the FCM's 30.7 Customers. As explained below, Commission Rule 30.7 restricts the amount of such funds that may be held outside of the U.S.

Customers trading on foreign markets assume additional risks. Laws or regulations will vary depending on the foreign jurisdiction in which the transaction occurs, and funds held in a 30.7 Account outside of the U.S. may not receive the same level of protection as Customer Segregated Funds. If the foreign broker carrying 30.7 Customer positions fails, the broker will be liquidated in accordance with the laws of the jurisdiction in which it is organized, which laws may differ significantly from the U.S. Bankruptcy Code. Return of 30.7 Customer Funds to the U.S. will be delayed and likely will be subject to the costs of administration of the failed foreign broker in accordance with the law of the applicable jurisdiction, as well as possible other intervening foreign brokers, if multiple foreign brokers were used to process the U.S. customers' transactions on foreign markets.

If the foreign broker does not fail but the 30.7 Customers' U.S. FCM fails, the foreign broker may want to assure that appropriate authorization has been obtained before returning the 30.7 Customer Funds to the FCM's trustee, which may delay their return. If both the foreign broker and the U.S. FCM were to fail, potential differences between the trustee for the U.S. FCM and the administrator for the foreign broker, each with independent fiduciary obligations under applicable law, may result in significant delays and additional administrative expenses. Use of other intervening foreign brokers by the U.S. FCM to process the trades of 30.7 Customers on foreign markets may cause additional delays and administrative expenses.

To reduce the potential risk to 30.7 Customer Funds held outside of the U.S., Commission Rule 30.7 generally provides that an FCM may not deposit or hold 30.7 Customer Funds in permitted accounts outside of the U.S. except as necessary to meet margin requirements, including prefunding margin requirements, established by rule, regulation, or order of the relevant foreign boards of trade or foreign clearing organizations, or to meet margin calls issued by foreign brokers carrying the 30.7 Customers' positions. The rule further provides, however, that in order to avoid the daily transfer of funds from accounts in the U.S., an FCM may maintain in accounts located outside of the U.S. an additional amount of up to 20% of the total amount of funds necessary to meet margin and prefunding margin requirements to avoid daily transfers of funds.

**Cleared Swaps Customer Account.** Funds deposited with an FCM, or otherwise required to be held for the benefit of customers, to margin swaps cleared through a registered DCO, that is, **Cleared Swaps Customer Collateral**, are held in a **Cleared Swaps Customer Account** in accordance with the provisions of section 4d(f) of the Act and Part 22 of the Commission's rules. Cleared Swaps Customer Accounts are sometimes referred to as LSOC Accounts. LSOC is an acronym for "legally separated, operationally commingled." Funds required to be held in a Cleared Swaps Customer Account may be commingled in an omnibus account and held with: (i) a bank or trust company located in the U.S.; (ii) a bank or trust company located outside of the U.S. that has in excess of US$1 billion of regulatory capital; (iii) a DCO; or (iv) another FCM. Such commingled account must be properly titled to make clear that the funds belong to, and are being held for the benefit of, the FCM's Cleared Swaps Customers.

**Investment of Customer Funds.** Section 4d(a)(2) of the Act authorizes FCMs to invest Customer Segregated Funds in obligations of the United States, in general obligations of any State or of any political subdivision thereof, and in obligations fully guaranteed as to principal and interest by the United States. Section 4d(f) authorizes FCMs to invest Cleared Swaps Customer Collateral in similar instruments.

Commission Rule 1.25 authorizes FCMs to invest Customer Segregated Funds, Cleared Swaps Customer Collateral, and 30.7 Customer Funds in instruments of a similar nature. Commission rules further provide that the FCM may retain all gains earned and is responsible for investment losses incurred in connection with the investment of Customer Funds.

Permitted investments include:

(i) Obligations of the United States and obligations fully guaranteed as to principal and interest by the United States (U.S. government securities);

(ii) General obligations of any State or of any political subdivision thereof (municipal securities);

(iii) Obligations of any United States government corporation or enterprise sponsored by the United States government (U.S. agency obligations)[3];

(iv) Certificates of deposit issued by a bank (certificates of deposit) as defined in section 3(a)(6) of the Securities Exchange Act of 1934, or a domestic branch of a foreign bank that carries deposits insured by the Federal Deposit Insurance Corporation;

(v) Commercial paper fully guaranteed as to principal and interest by the United States under the Temporary Liquidity Guarantee Program as administered by the Federal Deposit Insurance Corporation (commercial paper);

(vi) Corporate notes or bonds fully guaranteed as to principal and interest by the United States under the Temporary Liquidity Guarantee Program as administered by the Federal Deposit Insurance Corporation (corporate notes or bonds); and

(vii) Interests in money market mutual funds.

The duration of the securities in which an FCM invests Customer Funds cannot exceed, on average, two years.

An FCM may also engage in repurchase and reverse repurchase transactions with nonaffiliated registered broker-dealers, provided such transactions are made on a delivery versus payment basis and involve only permitted investments. All funds or securities received in repurchase and reverse repurchase transactions with Customer Funds must be held in the appropriate Customer Account, that is, Customer Segregated Account, 30.7 Account, or Cleared

---

[1] Money center countries means Canada, France, Italy, Germany, Japan, and the United Kingdom.

[2] Money center currencies means the currency of any money center country and the Euro.

[3] Obligations issued by the Federal National Mortgage Association or the Federal Home Loan Mortgage Association are permitted only while these entities operate under the conservatorship or receivership of the Federal Housing Finance Authority with capital support from the United States.

TDA 614 F 01/20

Swaps Customer Account. Further, in accordance with the provisions of Commission Rule 1.25, all such funds or collateral must be received in the appropriate Customer Account on a delivery versus payment basis in immediately available funds[4].

**No SIPC Protection.** Although TD Ameritrade, Inc. is a registered broker-dealer, it is important to understand that the funds you deposit with TD Ameritrade Futures & Forex LLC for trading futures and options on futures contracts on either U.S. or foreign markets or cleared swaps are not protected by the Securities Investor Protection Corporation.

Further, Commission rules require TD Ameritrade Futures & Forex to hold funds deposited to margin futures and options on futures contracts traded on U.S. designated contract markets in Customer Segregated Accounts. Similarly, TD Ameritrade Futures & Forex must hold funds deposited to margin cleared swaps and futures and options on futures contracts traded on foreign boards of trade in a Cleared Swaps Customer Account or a 30.7 Account, respectively. In computing its Customer Funds requirements under relevant Commission rules, TD Ameritrade Futures & Forex may only consider those Customer Funds actually held in the applicable Customer Accounts and may not apply free funds in an account under identical ownership but of a different classifcaition or account type (for example, securities, Customer Segregated, 30.7) to an account's margin deficiency. In order to be used for margin purposes, the funds must actually transfer to the identically owned undermargined account.

For additional information on the protection of customer funds, please see the Futures Industry Association's "Protection of Customer Funds Frequently Asked Questions" located at www.futuresindustry.org/downloads/PCF_questions.pdf.

## FILING A COMPLAINT

A customer that wishes to file a complaint about TD Ameritrade Futures & Forex or one of its employees with the Commission can contact the Division of Enforcement either electronically at https://forms.cftc.gov/fp/complaintform.aspx or by calling the Division of Enforcement toll-free at 866-FON-CFTC (866-366-2382).

A customer may file a complaint about TD Ameritrade Futures & Forex or one of its employees with the National Futures Association electronically at https://www.nfa.futures.org/basicnet/Complaint.aspx or by calling NFA directly at 800-621-3570.

## RELEVANT FINANCIAL DATA

TD Ameritrade Futures & Forex's annual audited financial statements are available here: https://www.tdameritrade.com/retail-en_us/resources/pdf/TDAFF_Website_certified annual_report.pdf

**Financial Data as of month end November, 2019**

| | |
|---|---|
| Total Equity | US$212,350,046 |
| Regulatory Capital | US$147,322,953 |
| Net Worth | US$212,350,046 |
| Proprietary margin requirements as a percentage of the aggregate margin requirement for: | |
| futures customers | US$0 |
| cleared swaps customers | N/A |
| 30.7 customers | N/A |
| Number of futures customers, cleared swaps customers, and 30.7 customers that comprise 50% of the FCM's total funds held for: | |
| futures customers | 283 |
| cleared swaps customers | N/A |
| 30.7 customers | N/A |
| Aggregate notional value of all nonhedged, principal over-the-counter transactions | N/A |
| Unsecured lines of credit the FCM has obtained but not yet drawn upon* | US$45,000,000 |
| Aggregated amount of financing the FCM provides for customer transactions involving illiquid financial products | 0 |
| Percentage of futures customer, cleared swap customer, and 30.7 customer receivable balances that the FCM had to write off as uncollectable during the past 12-month period | 0 |

At this time, TD Ameritrade Futures & Forex customers do not engage in activity that requires a 30.7 account or in cleared swap activity. As such, TD Ameritrade Futures & Forex does not have any data to report 30.7 activity or cleared swap activity.

Additional financial information on all FCMs is also available on the Commission's website at: http://www.cftc.gov/MarketReports/FinancialDataforFCMs/index.htm.

Customers should be aware that the National Futures Association (NFA) publishes on its website certain financial information with respect to each FCM. The FCM Capital Report provides each FCM's most recent month-end adjusted net capital, required net capital, and excess net capital. (Information for a twelve-month period is available.) In addition, NFA publishes twice-monthly a Customer Segregated Funds report, which shows for each FCM: (i) total funds held in Customer Segregated Accounts; (ii) total funds required to be held in Customer Segregated Accounts; and (iii) excess segregated funds, that is, the FCM's Residual Interest. This report also shows the percentage of Customer Segregated Funds that are held in cash and each of the permitted investments under Commission Rule 1.25. Finally, the report indicates whether the FCM held any Customer Segregated Funds during that month at a depository that is an affiliate of the FCM.

---

[4] As discussed below, NFA publishes twice-monthly a report, which shows for each FCM, inter alia, the percentage of Customer Funds that are held in cash and each of the permitted investments under Commission Rule 1.25. The report also indicates whether the FCM held any Customer Funds during that month at a depository that is an affiliate of the FCM.

The report shows the most recent semimonthly information, but the public will also have the ability to see information for the most recent twelve-month period. A 30.7 Customer Funds report and a Customer Cleared Swaps Collateral report provides the same information with respect to the 30.7 Account and the Cleared Swaps Customer Account.

The above financial information reports can be found by conducting a search for a specific FCM in NFA's BASIC system (http://www.nfa.futures.org/basicnet/) and then clicking on "View Financial Information" on the FCM's BASIC Details page.

*The generic source is TD Ameritrade Holding Corp. and the purpose is Contingent liquidity.

## RISK MANAGEMENT SUMMARY

TD Ameritrade Futures & Forex has established, maintains, and enforces a system of risk management policies and procedures designed to monitor and manage the risks associated with the activities of TD Ameritrade Futures & Forex. TD Ameritrade Futures & Forex maintains written policies and procedures that describe the Risk Management Program, which will be submitted to the CFTC per § 1.11. As part of the Risk Management Program, TD Ameritrade Futures & Forex has established and maintains a Risk Management Unit with sufficient authority, qualified personnel, and financial, operational, and other resources to carry out the Risk Management Program. The Risk Management Unit reports directly to Senior Management and is independent from the business unit.

### Risk Management Program
TD Ameritrade Futures & Forex currently has multiple, robust risk management processes in place. TD Ameritrade Futures & Forex's Risk Management Program includes, but is not limited to, identifying risks and risk tolerance limits, periodic risk exposure reports, and policies and procedures to monitor segregation, capital, and operational risks.

### Identifying Risks and Risk Tolerance Limits
TD Ameritrade Futures & Forex's Risk Management Program takes into account market, credit, liquidity, foreign currency, legal, operational, settlement, segregation, technological, capital, and other applicable risks with a description of the risk tolerance limits and methodology for these limits.

### Periodic Risk Exposure Reports
The Risk Management Unit provides senior management and the CFTC quarterly written reports setting forth all applicable risk exposures of TD Ameritrade Futures & Forex, any recommended or completed changes to the Risk Management Program and time frame for implementing recommended changes, and the status of any incomplete implementation of previously recommended changes to the Risk Management Program.

### Segregation Risk
As part of TD Ameritrade's Risk Management Program in regards to segregation risk, the following processes and procedures have been established:

As part of TD Ameritrade Futures & Forex's Risk Management Program in regards to segregation risk, the following processes and procedures have been established:

- Policies designed to manage segregation risk, including a process for the evaluation of depositories for segregated funds;

- A process designed to monitor the residual interest TD Ameritrade Futures & Forex seeks to maintain in the segregated funds accounts;

- A process designed for the withdrawal of cash or property from accounts holding segregated funds, where withdrawal is not for payment or on behalf of TD Ameritrade Futures & Forex's customers;

- A process for assessing the appropriateness of specific investments of segregated funds;

- Procedures requiring the appropriate separation of duties among individuals responsible for compliance with regulations relating to the protection and financial reporting of segregated funds;

- A process and procedures for timely recording of transactions;

- A program for annual training of all officers and employees regarding the segregation requirements for segregated funds;

- Policies for assessing the liquidity and mark-to-market valuation of all noncash assets held as segregated funds.

### Operational Risk
TD Ameritrade Futures & Forex's Risk Management Program includes automated controls designed to prevent the placing of erroneous trade orders. The Risk Management Program also ensures the supervision, maintenance, testing, and inspection of automated trading programs.

### Capital Risk
TD Ameritrade Futures & Forex's Risk Management Program ensures that TD Ameritrade Futures & Forex has sufficient capital to be in compliance with the Act and the regulations, and sufficient capital and liquidity to meet the reasonably foreseeable needs of TD Ameritrade Futures & Forex.

### Supervision and Testing of the Risk Management Program
TD Ameritrade Futures & Forex's Risk Management Program includes a supervisory system that is reasonably designed to ensure that the policies and procedures are diligently followed. The Risk Management Program is reviewed and tested at least annually by internal audit staff or a third party audit service that is independent of the business unit. TD Ameritrade Futures & Forex documents all internal and external reviews of the Risk Management Program.

### Distribution of the Risk Management Policies and Procedures
TD Ameritrade Futures & Forex's written risk management procedures are distributed to supervisory personnel and a record of such distribution is maintained. Written approvals and all records or reports are maintained in accordance with § 1.31.

Despite TD Ameritrade Futures & Forex's efforts to manage risk through policies, procedures, and governance structures, there can be no assurance that TD Ameritrade Futures & Forex will not sustain material losses as part of its operation.

## LEVERAGE RATIO

The Firm's Leverage Ratio is provided pursuant to CFTC Rule 1.55(k)(5). As of December 1, 2019, the Firm's Leverage Ratio was 1.21.

This Disclosure Document was first used on January 1, 2020.

TDA 614 F 01/20

TD Ameritrade Futures & Forex LLC. Securities brokerage services provided by TD Ameritrade, Inc., member FINRA/SIPC. TD Ameritrade is a trademark jointly owned by TD Ameritrade IP Company, Inc. and The Toronto-Dominion Bank. © 2020 TD Ameritrade.

TDA 614 F 01/20