IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN LINDSTROM, *individually and on behalf of others similarly situated*, | ) ) ) |
| *Plaintiff*, | ) ) |
| v. | ) No. 20 C 4028 ) ) Judge Virginia M. Kendall |
| TD AMERITRADE, INC., and TD AMERITRADE FUTURES & FOREX, LLC d/b/a THINKORSWIM, | ) ) ) ) |
| *Defendants*. | ) |

## MEMORANDUM ORDER AND OPINION

John Lindstrom is an individual who owned crude oil futures positions through an account with TD Ameritrade Futures & Forex ("TDAFF"). During the initial economic shock caused by the COVID-19 pandemic, crude oil futures contracts traded on the New York Mercantile Exchange ("NYMEX") fell into the negatives. TDAFF liquated Lindstrom's positions while they were valued in the negatives, which resulted in a $66,390 loss on three crude oil contracts. Lindstrom and his co-plaintiff, Wei Wang, brought this action against TD Ameritrade ("TDA") and TDAFF alleging that Defendants violated the Commodity Exchange Act ("CEA") and associated regulations. Plaintiffs also allege a breach of the implied covenant of good faith and fair dealing, negligence, and breach of contract. The Court has since compelled arbitration of Wei Wang's claims. (Dkt. 51.) Lindstrom did not enter into an arbitration agreement, so his claims remain pending. Defendants now move to dismiss all of Lindstrom's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Motion (Dkt. 24) is granted.

1

**BACKGROUND**[1]

The following allegations of fact come from Lindstrom's Amended Complaint, and the Court assumes their truth for purposes of this Motion. *See W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

Lindstrom is an individual investor who had a brokerage account with TDAFF and a securities account with TDA. (Dkt. 17 ¶¶ 22–23.) Lindstrom invested in futures contracts[2] for May 2020 NYMEX Light Sweet Crude Oil ("May 2020 Crude"). (*Id.* ¶ 23.) As of April 20, 2020, Lindstrom's TDAFF account contained "substantial long positions" for May 2020 Crude. (*Id.* ¶ 27.) He also held long positions in E-mini Light Sweet Crude ("E-Mini Crude") futures in his TDAFF account. (*Id.* ¶ 28.) Both of these futures are traded on the Chicago Mercantile Exchange ("CME"). (*Id.* ¶ 29.)

On April 8, 2020, as the economic downturn caused by the COVID-19 pandemic accelerated, the CME published a regulatory advisory entitled "CME Clearing Plan to Address Potential Negative Underlying in Certain Energy Options Contracts." (Dkt. 17 ¶ 30.) The purpose of the advisory was to "let the market know that CME Clearing is ready to handle the situation of negative underlying prices in major energy contracts and to give all of our clearing firms, customers, and partners a view into what the CME Clearing plan is so that each of our partners can do their own planning for this potential situation." (*Id.*) The advisory announced that CME had been testing plans that would allow for negative prices in West Texas Intermediate crude oil futures. (*Id.*)

---

[1] The allegations of fact described herein pertain only to Plaintiff Lindstrom. The Court did not consider allegations pertaining only to Plaintiff Wang because the Court compelled arbitration of his claims.
[2] A futures contract is a "legally binding agreement to buy or sell a standardized asset on a specific date or during a specific month." (Dkt. 17 ¶ 24.)

2

The CME followed up with a second advisory on April 15, 2020 indicating that firms would now be able to test negative futures on CME systems for crude oil products. (*Id.* ¶ 31.)

On the morning of April 20, 2020, Lindstrom's account had a margin call[3] on it in the amount of $8,402.50. (*Id.* ¶ 45.) To cover that margin call, he transferred $30,000 into his futures account. (*Id.*) He believed that this would be more than enough to meet the margin call and maintain his futures contracts in the event the market continued its decline. (*Id.* ¶ 46.)

The CME issued a third advisory on April 20, 2020 at 10:50 am CST warning that crude oil futures could fall into the negatives. (Dkt. 17 ¶ 32.) By 2:08 pm CST, CME's warning became reality, and by the end of trading session e-Mini futures' prices dropped to -$37.62. (*Id.* ¶ 33.) As the price plummeted below zero dollars, TDAFF permitted Lindstrom's position to remain in his account despite the fact that his account had now become under-margined even after accounting for the $30,000 influx from that morning. (*Id.* ¶ 47.) Once the positions fell into the negatives, TDAFF's system was unable to accept orders because it did not recognize negatively priced crude oil orders. (*Id.* ¶ 41.)[4] His positions remained in the account until TDAFF liquidated them. (*Id.* ¶ 48.) As a result, he lost all of the cash in the account, for a total loss of $66,390. (*Id.* ¶¶ 48–49.)

TDAFF took no action to limit the losses of investors when crude oil futures fell into the negatives. (Dkt. 17 ¶ 56.) TDAFF did not, for example, liquidate Lindstrom's positions as soon as they fell into the negatives; instead, TDAFF allowed those positions to remain open as they plummeted further and further into negative territory. (*Id.*) TDAFF also did not contact its clients

---

[3] In the futures market, account holders must maintain cash deposits with the futures broker. These funds are called "margin." When the account equity drops below the margin requirements for an account, a broker issues a "margin call," which requires the investor to restore equity in the account. (Dkt. 17 ¶ 51.) If a margin call is not met within a short time frame, an investor's position may be liquidated. (*Id.*)

[4] The Amended Complaint does not indicate that Lindstrom actually tried to place an order while the prices were in the negatives, but just that if he had tried, the system would have rejected the order saying "future orders must have a positive price limit." (Dkt. 17 ¶ 41.)

3

when the market hit zero to give them the option of exiting, modifying, or offsetting their positions by placing an order. (*Id.* ¶ 41.) Nor did TDAFF ever alert its clients prior to April 20th that the futures contracts could fall into the negatives. (*Id.* ¶ 57.)

TDAFF provided Lindstrom with a risk disclosure agreement when he signed up for an account. (Dkt. 17 ¶ 34.) The disclosure warned that investing in futures involved risks, but the agreement did not specifically warn that prices could fall into the negatives. (*Id.*)

## LEGAL STANDARD

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must construe the complaint "in a light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in the non-moving party's favor." *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016). The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A party need not plead "detailed factual allegations," but "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must contain sufficient factual matter that when "accepted as true . . . 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

Lindstrom brings a claim under § 6b(e)(3) of the CEA and 17 C.F.R. § 180.1. This claim sounds in fraud. Any allegation of fraud must be "state[d] with particularity," although "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). This heightened pleading requirement protects against the "great harm to the reputation of a business firm or other enterprise a fraud claim can do." *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). Rule 9(b) requires that the plaintiff state "the identity of

4

the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Svc's, Inc.*, 536 F.3d 663, 668 (7th Cir. 2008). In other words, the plaintiff must allege the "who, what, when, where, and how" of the alleged fraud. *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019) (quoting *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019).

## DISCUSSION

### I. Commodity Exchange Act Fraud Claim

Count I of the Amended Complaint alleges that Defendants violated the Commodity Exchange Act, 7 U.S.C. § 9, and 17 C.F.R. § 180.1, a regulation promulgated by the CFTC pursuant to the CEA. Specifically, Lindstrom alleges that Defendants violated 17 C.F.R. § 180.1(a)(3), which reads:

> (a) It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
> . . .
> (3) Engage, or attempt to engage in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

In short, this is a securities fraud claim. To state a claim for federal securities fraud, a complaint must allege "(1) a material misrepresentation or omission by the defendant, (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security;[5] (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Cornielsen v. Infinium Cap. Mgmt.*, 916 F.3d 589, 598 (7th Cir. 2019) The Court addresses these elements in turn.

---

[5] The Parties did not brief this element, presumably because it is not a good fit for the allegations in this case.

A.     **Material Misrepresentation or Omission**

Lindstrom alleges that TDAFF committed three material omissions. (Dkt. 17 ¶ 80–81.) The first alleged omission is TDAFF's failure to "notify/advise their customers of material information regarding the crude oil markets, that it had the potential to go to zero, although it was clear based upon the CME's advisory that the contract had the potential to go to zero . . . ." (*Id.* ¶ 80.) The problem for Lindstrom is that he fails to identify any duty that TDAFF owed to Lindstrom to inform him of market trends. Futures trading is risky, and TDAFF made Lindstrom aware of that before he could even sign up for an account. Moreover, contemporaneous newspaper articles referenced in TDAFF's Motion make clear that the possibility the oil prices could fall into the negatives was widely reported in the media. *See, e.g.*, John Stepek, MONEYWEEK, *Oil Prices Have Collapsed—And Some Argue That They Could Even Turn Negative*, Mar. 30, 2020, https://moneyweek.com/investments/commodities/energy/oil/601069/oil-prices-have-collapsed-and-some-argue-that-they-could; Jonathan Garber, *Oil Prices Could Fall Below Zero: Analyst*, YAHOO! FINANCE, Mar. 18, 2020, https://finance.yahoo.com/news/oil-prices-could-fall-below-152446634.html. Likewise, each of the CME advisories to which the Amended Complaint refers were publicly available. *See, e.g.*, CME Clearing, "Testing Opportunities in CME's 'New Release' Environment for Negative Prices and Strikes for Certain NYMEX Energy Contracts," Apr. 15, 2020, https://www.cmegroup.com/content/dam/cmegroup/notices/clearing/2020/04/Chadv20-160.pdf.[6] Lindstrom has cited no authority to suggest that an investment platform has an affirmative duty to make its users aware of publicly available information that may negatively

---

[6] The Court can take judicial notice of the articles and advisories at the pleading stage without converting this Motion into a motion for summary judgment because they discuss facts discussed in the Amended Complaint and because the articles were in the public domain and the time of the events giving rise to this action. *See United States ex rel. John v. Hastert*, 82 F. Supp. 36 750, 764 (N.D. Ill. 2015) (taking judicial notice of newspaper articles attached to a motion to dismiss to conclude that information contained in the complaint was in the public realm at the time) (citing *United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 (11th Cir. 2015)).

affect their investments. Indeed, TDAFF has no fiduciary obligations to Lindstrom, (Dkt. 17 at p. 36) ("Client further acknowledges and agrees that: . . . (iii) [TDAFF] has no fiduciary obligations to Client . . . ."), so there is no basis for imposing liability on TDAFF for failing to affirmatively disclose publicly available information.

The second alleged omission is a failure to liquidate Lindstrom's contracts at a commercially reasonable time. The Amended Complaint alleges that TDAFF should have taken action to liquidate Lindstrom's contracts at or about the moment that the contracts fell into the negatives, but that by waiting until the contracts had fallen deep into the negatives, TDAFF acted in a commercially unreasonable manner that left Lindstrom farther in the red than he needed to be. The Futures Client Agreement, however, "authorizes [TDAFF], without prior notice and in its sole discretion, to liquidate any assets held by TD Ameritrade Clearing, Inc. in a Securities Account to eliminate [any] margin deficiency or insecurity." (Dkt. 17 at p. 37.) That is precisely what happened here; Lindstrom's account became under-margined as the futures prices continued to drop, so TDAFF exercised its discretion to liquidate. Lindstrom fails to identify any principle that would support imposing liability on TDAFF for exercising its right to liquidate securities held in under-margined accounts.

The third alleged omission is TDAFF's failure to enable protocols on its platform that would permit investors to place negatively-priced trades. This is Lindstrom's best allegation of a legally actionable omission, considering that TDAFF was aware that prices were likely to go negative and allegedly took no action to prepare its systems for that eventuality. The complication here is that there is no allegation that Lindstrom ever tried to place a trade while the prices were in the negatives, so he lacks standing to pursue a claim based on this omission. *See Spokeo v. Robins*, 136 S. Ct. 1540, 1548 (2016) (explaining that plaintiffs lack standing unless they allege a concrete

7

and particularized injury). Lindstrom cannot plausibly claim that he was injured unless he actually tried to use the system that TDAFF failed to prepare.

It appearing that Lindstrom has failed to allege an actionable omission, the Court could end the analysis here. In the interest of being thorough, however, the Court will address the other elements of a securities fraud claim.

**B.     Scienter**

A misrepresentation or omission if it was made with scienter. Scienter requires an "intention to 'deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976)). In determining whether the plaintiff has made an adequate allegation of scienter, "the reviewing court must ask: When the allegations are taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326. In this case, it is not reasonable to infer that TDAFF made any of the alleged omissions with an intent to deceive or defraud. In fact, TDAFF had an obvious motive to inform its customers of the market conditions—namely, if an account becomes so under-margined that the customer no longer has the means to meet a margin call, TDAFF may be liable for covering the loss. *See ADM Investor Servs., Inc. v. Collins*, 515 F.3d 753, 756 (7th Cir. 2008) (explaining that if an investor is unable to meet a margin call, "[t]he futures commission merchant then is on the hook, for it is a condition of participation in these markets that each dealer guarantee customers' trades"). Given that TDAFF had a motive to avoid a situation in which its customers could not satisfy a large margin call, it would hardly be reasonable to infer that TDAFF intended for this to occur to Lindstrom. The Amended Complaint's allegations of scienter are insufficient.

### C. Reliance

Lindstrom's theory of reliance is that he would have sold his positions sooner had TDAFF not failed to update its systems to accept negatively-priced trades. But again, he never alleges that he tried to sell his positions sooner or that he would have lost any less money had TDAFF made that adjustment. The Amended Complaint lacks any allegation of actual reliance.

### D. Loss & Loss Causation

Lindstrom lost a substantial sum of money, and he lost it quickly. April 20, 2020 was the first day in history that oil futures contracts fell below zero dollars. It is undeniable that this unprecedented market volatility was the proximate cause and a but-for cause of his losses. The Amended Complaint contains no allegations that TDAFF's omissions were the proximate cause or but-for cause of Lindstrom's losses. He does not allege that he would have done anything differently had TDAFF forwarded the CME advisories to him, nor if TDAFF had prepared its systems to sell negatively-priced contracts. In fact, Lindstrom argues that he need not allege loss causation at all. That cannot be correct. It is axiomatic that the defendant in a lawsuit must cause the harm alleged.

Lindstrom has failed to state any of the elements of a securities fraud claim under 7 U.S.C § 9 and 17 C.F.R. § 180.1(a)(3).

## II. Breach of Implied Covenant of Good Faith and Fair Dealing

Count II of the Amended Complaint alleges that TDAFF breached the implied covenant of good faith and fair dealing embedded within the Futures Client Agreement. The Parties do not dispute that Nebraska law governs this count because the Futures License Agreement so stipulates. (Dkt. 17 at p. 40.) Under Nebraska law, "the implied covenant of good faith and fair dealing exists in every contract and requires that none of the parties to the contract do anything which will injure

the right of another party to receive the benefit of the contract." *Reichert v. Rubloff Hammond, LLC*, 645 N.W.2d 519, 526 (Neb. 2002). Lindstrom's theory here is that TDAFF violated this covenant by not liquidating his contracts until they became excessively under-margined and by not creating a means by which Lindstrom could have placed an order to exit his positions at a negative price. Lindstrom does not identify any contract provision that would have required TDAFF to take either of those actions. With respect to liquidation, the Futures Client Agreement specifically grants TDAFF the "sole discretion" to liquidate "without prior notice to Client" so as to eliminate any margin deficiency, and that "Client shall remain liable to TDAFF for any loss or debit balance that results." (Dkt. 17 at p. 37.) The action TDAFF took here is specifically contemplated by the contract, so it did not injure Lindstrom's rights under the contract. With respect to placing negatively priced orders, it bears repeating that Lindstrom never alleges that he attempted to place such an order or that he knew that TDAFF did not have the capability to fulfill such an order. As such, TDAFF's failure to create such a system caused him no injury. Count II does not state a claim.

### III. Commodity Exchange Act Section 6b(e)(3)

Count III is a single-sentence count alleging a violation of § 6b(e)(3) of the CEA. This claim is practically identical to the CEA claim in Count I. Lindstrom does not contend that it is any different from Count I. Count III fails for the same reasons.

### IV. Negligence & Gross Negligence

Counts IV and V allege that TDAFF was negligent and grossly negligent through the omissions described above in Section I.A. To state a claim for negligence, a plaintiff "must allege facts sufficient to establish three elements: (1) the existence of a duty of care owed to the plaintiff by the defendant; (2) a breach of that duty, and (3) an injury proximately caused by that breach."

*Guvenoz v. Target Corp.*, 30 N.E.3d 404, 422 (Ill. App. Ct. 2015).[7] To state a claim for gross negligence, the complaint must contain facts showing "a high degree of negligence, an element of recklessness and the absence of the slightest degree of care." *Samoylovich v. City of Chicago*, 2019 IL App (1st) 172962-U, 2019 WL 1462194, at *8 (Ill. App. Ct. Mar. 29, 2019). TDAFF moves to dismiss these counts on the grounds that they are precluded by the economic loss doctrine. "At common law, solely economic losses are generally not recoverable in tort actions." *In re Chicago Flood Litigation*, 660 N.E.2d 265, 274 (Ill. 1997). Indeed, a plaintiff "'seeking to recover purely economic losses due to defeated expectations of a commercial bargain cannot recover in tort, regardless of the plaintiff's inability to recover under an action in contract.'" *Id.* at 275 (citing *Anderson Electric, Inc. v. Ledbetter Erection Corp.*, 503 N.E.2d 246 (1986)). This is precisely the situation here. Lindstrom suffered pure economic losses, and Lindstrom has not identified any duty TDAFF would owe to Lindstrom other than duties created by contract. Even assuming that the economic loss doctrine does not apply here, Lindstrom has failed to allege facts indicating that TDAFF caused his losses. Indeed, Lindstrom's allegations make clear that unprecedented volatility combined with a risky investment caused his losses. Counts IV and V are dismissed without prejudice.

## V. Breach of Contract

Count VII[8] alleges that TDAFF breached the Futures Client Agreement by (1) not contacting Lindstrom prior to liquidating his positions (Dkt. 17 ¶101), (2) not testing its system to correct deficiencies (*id.* ¶ 105), and (3) by not updating its systems to conform with CME customs and usages as described in the CME advisories. (*Id.* ¶ 103). None of these allegations constitute a

---

[7] The Parties cite Nebraska tort law because the contract's choice-of-law provision specifies Nebraska law, but a negligence claim does not arise out of a contract.
[8] The Amended Complaint contains no Count VI. It skips from Count V to Count VII.

breach of contract. First, Lindstrom has failed to identify any provision in the contract requiring notification prior to liquidation. To the contrary, the contract specifically states that TDAFF may liquidate "without prior notice and in its sole discretion." (Dkt. 17 at p. 37.) Second, even assuming that a provision of that contract could be interpreted to require TDAFF to update its systems to accept negatively-priced orders, Lindstrom fails to allege that he was harmed by this omission. *See Fast Ball Sports, LLC v. Metro. Entm't & Convention Auth.*, 835 N.W.2d 782, 790 (Neb. 2013) (explaining that an element of breach of contract is that the defendant must have caused the plaintiff damage). Third, Lindstrom also does not allege facts indicating that TDAFF's failure to act in accordance with the CME's advisories caused him any harm. Again, if TDAFF had acted in some fashion on the CME advisories, it is unclear how that action would affect Lindstrom's losses. He does not contend that he attempted to mitigate his own losses or that TDAFF's system thwarted any such attempt. The Amended Complaint does not plausibly suggest a causal connection between TDAFF's alleged failure to take action in light of the CME advisories and the extent of Lindstrom's injuries.

## VI. Declaratory Relief

Count VIII is a request for declaratory relief. Here, Plaintiff Wang seeks a declaration that the Futures Arbitration Agreement to which Wang agreed is invalid because TDAFF does not comply with electronic signature requirements provided for in 17 C.F.R. §§ 1.3–1.4. But the CEA provides that a private right of action brought under CFTC regulations requires actual damages. 7 U.S.C. § 25(a) ("Any person . . . who violates this chapter . . . shall be liable for actual damages . . . ."). This is the exclusive remedy for violations of these regulations. 7 U.S.C. § 25(a)(2) ("[T]he rights of action authorized by this subsection . . . shall be the exclusive remedies under this chapter . . . ."). Wang does not allege any damages at all resulting from the

bookkeeping issues he identifies. He simply seeks a declaration that the signatures do not meet the requirements of the CFTC regulations. He does not allege that any damages resulted. Count VII must also be dismissed.

## VII. Claims Against TD Ameritrade

The Amended Complaint's allegations pertain almost exclusively to TDAFF. TDA receives nothing more than a few passing references. Most of the count-specific allegations never even mention TDA. The Amended Complaint leaves the Court unsure about why TDA is even a defendant in this case. The scant allegations against TDA do not satisfy the federal pleading standards, so all the claims against TDA are dismissed without prejudice.

## CONCLUSION

Plaintiffs, like many investors in the first half of 2020, lost a great deal of money. COVID-19 is responsible for those losses. Plaintiffs fail to plausibly connect TDA and TDAFF to those losses.

The Motion to Dismiss [24] is granted in its entirety and the Amended Complaint is dismissed without prejudice.

_____
Virginia M. Kendall
United States District Judge

Date: December 17, 2020

13